Barq's Bottling Company v. Commissioner.
Barq's Bottling Co. v. Commissioner
Docket No. 6758.
United States Tax Court
1946 Tax Ct. Memo LEXIS 158; 5 T.C.M. (CCH) 505; T.C.M. (RIA) 46150; June 21, 1946
*158 1. A "reasonable allowance" for salaries of petitioner's two officers and sole stockholders is determined from the evidence. 2. Petitioner was incorporated in 1938. It acquired certain rights to bottle, manufacture and sell a certain soft drink in a limited territory. Its two stockholders would have preferred to operate as a partnership but due to the franchise not being transferable, they incorporated instead. The purpose for which petitioner was formed was limited in its character "to bottle carbonated water, soda water and soft drinks." In 1942 the two stockholders in order to carry out their original plans to take on other lines, to adopt a brand of their own, and to give more time to petitioner's officers to devote to the production end of petitioner's operations, formed a partnership which purchased and distributed about 85 to 90 percent of petitioner's output. Held, the partnership was not a sham but was a valid and bona fide partnership. Held, further, the respondent erred in including the net income of the partnership in petitioner's gross income under section 45, Internal Revenue Code. Seminole Flavor Company, 4 T.C. 1215, followed. 3. Where petitioner *159 has shown that failure to file return on time was due to reasonable cause and was not due to willful neglect, held, addition of penalty for failure to file on time should not be made. Wright K. Smith, Esq., Kirby Bldg., Dallas, Tex., for the petitioner. John W. Alexander, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax, declared value excess-profits tax and *160 excess profits tax for the taxable years ended May 31, 1942 and May 31, 1943, and a 15 percent penalty for failure to file the excess profits tax return for the taxable year ended May 31, 1943 on time, in amounts as follows: Year
Year
Ended
Ended
May 31,
May 31,
Kind of Tax
1942
1943
Penalty
Income
$ 777.58
$ 1,356.66
Declared Value
Excess-Profits
803.20
Excess Profits
1,900.84
19,448.36
$2,917.25
The deficiencies for the taxable year ended May 31, 1942 are due in part to an adjustment to net income capitioned "(a) Excessive officers' salaries $6,000.00" which the respondent explained in a statement attached to the deficiency notice as follows: (a) It has been determined that $12,000.00 represents a reasonable allowance for officers' salaries and that the deduction in the return of $6,000.00 in excess of that amount is disallowed as representing a distribution of earnings. By an appropriate assignment of error petitioner contests this adjustment. The respondent also made some minor adjustments to net income for the taxable year ended May 31, 1942, which are not contested. The deficiencies for the taxable year ended May 31, 1943 are *161 due in part to two adjustments to net income captioned "(a) Excesive officers' salaries $12,000.00" and "(b) Partnership income $13,671.91" which adjustments the respondent explained in a statement attached to the deficiency notice as follows: (a) It has been determined that $12,000.00 represents a reasonable allowance for officers' salaries and that the deduction in the return of $12,000.00 in excess of that amount is disallowed as representing a distribution of earnings. (b) It has been determined that the amount of $13,671.91 reported as the net income of the so-called partnership, Barq's Distributing Company, was in fact the earnings of the corporation, Barq's Bottling Company, and that amount is included in the income of the corporation. It has also been determined that, since the corporation, Barq's Bottling Company, and the socalled partnership, Barq's Distributing Company, were owned and controlled directly and indirectly by the same persons, the said so-called partnership income should be apportioned and allocated in toto to the corporation in order to prevent evasion of taxes and to clearly reflect the income of the corporation as provided by section 45 of the Internal Revenue Code *162 . By appropriate assignments of error petitioner contests both of these adjustments, and also assigns error as to the determination of the penalty. The respondent also made some minor adjustments to net income for the taxable year ended May 31, 1943, which are not contested. Findings of Fact Petitioner was incorporated under the laws of the State of Texas on April 1, 1938. It operated as a corporation until January 3, 1944, when it was dissolved and a certificate of such dissolution was duly issued by the Secretary of State of the State of Texas. During petitioner's existence its principal office and place of business was located at 1301 Second Avenue, Dallas, Texas. The returns for the taxable years here involved were filed with the collector for the second district of Texas at Dallas. Petitioner kept its books of account on the accrual basis and so reported its income in its Federal income tax returns for the fiscal year periods ending May 31 of each year. B. B. Barnes and C. E. Sherman were president and secretary, respectively, of petitioner at all times here involved, and were its sole stockholders, owning such stock in equal portions. At the time of petitioner's dissolution *163 all of its assets were distributed in kind and were taken over by a partnership known as "Barq's Distributing Company" which partnership was owned by Barnes and Sherman in equal portions. No receiver was appointed by any court of the State of Texas to wind up the affairs of petitioner, and in accordance with the laws of that state, Barnes and Sherman, as trustees, filed the petition in this proceeding in the name of the corporation "Barq's Bottling Company." Petitioner's authorized capital stock was $10,000 (100 shares with a par value of $100 each), one-half of which was paid in equally by Barnes and Sherman at the time of incorporation. About a year later Sherman paid in another $2,500 and $2,500 par value of stock was issued to Barnes for services that he had rendered. The capital stock remained at $10,000 until petitioner was dissolved. Petitioner's charter states that the purpose for which petitioner was formed was "to bottle carbonated water, soda water and soft drinks." On September 16, 1937, a written agreement was made and entered into by and between Barq's, Incorporated, a corporation organized and existing under the laws of the State of Mississippi, a party of the first *164 part, and "Barq's Bottling Company (to be incorporated)" and referred to in the agreement as party of the second part. This agreement recited that the first party owned a secret formula for the manufacture of a certain beverage known as "Barq's Root Beer" and that the party of the first part wished to assign to the party of the second part "the rights to bottle, manufacture and sell 'Barq's Root Beer,' limited, however, to the following described territory, to-wit: The counties of: Dallas, Ellis, Kaufman and Rockwall. All in Texas." Petitioner bottled and sold Barq's Root Beer during its entire existence, and until the partnership of Barq's Distributing Company was organized on August 1, 1942, it handled exclusively the distribution of the drink in Dallas County and in part of Kaufman County. After August 1, 1942, the partnership distributed the drink in Dallas County and in part of Kaufman County. The partnership took from 85 to 90 percent of petitioner's entire output. The remaining output was sold by petitioner to other distributors in territory not covered by the partnership., After petitioner was dissolved the partnership continued to sell to these other distributors in the *165 territory not previously covered by the partnership. From the date on which petitioner was incorporated down through the period involved in this proceeding, petitioner did not pay any dividends. During this period its net income or (loss) before taxes and officers' salaries paid, as shown on its books and Federal income tax returns filed, were as follows: Officers'
Salaries Paid
Net Income
To
or (Loss) Be-
To
Sher-
Year Ended
fore Taxes
Barnes
man
May 31, 1939
($3,350.47)
$ 2,500
May 31, 1940
374.84
2,500
$ 1,875
May 31, 1941
498.42
5,400
5,400
May 31, 1942
7,043.44
9,000
9,000
May 31, 1943
772.70
12,000
12,000
The respondent in determining the deficiencies herein for the taxable year ended May 31, 1942, disallowed as representing a distribution of earnings $3,000 of the salaries paid to Barnes and $3,000 of the salaries paid to Sherman. Likewise for the taxable year ended May 31, 1943, the respondent disallowed $6,000 of the salaries paid to Barnes and $6,000 of the salaries paid to Sherman. The officers' salaries were fixed by the board of directors of petitioner at the annual meetings held at the beginning *166 of each fiscal year involved in this proceeding. The amount fixed for the fiscal year ended May 31, 1942, was $9,000 each to Barnes and Sherman, and for the fiscal year ended May 31, 1943, was $12,000 to each of them. Such salaries were included by each officer in his respective individual income tax return. Prior to June 15, 1942, the directors of petitioner were Barnes, Sherman and Mrs. Helen Barnes (wife of B. B. Barnes). On June 15, 1942, Helen Barnes resigned and H. J. Peters was elected to the board of directors. Peters was employed by petitioner as an accountant. The above mentioned "Net Income or (Loss) Before Taxes" for the years ended May 31, 1939 to May 31, 1943, inclusive, were arrived at on the Federal income tax returns filed by petitioner for those years in substantially the following manner: Yr. Ended
Yr. Ended
Yr. Ended
Yr. Ended
Yr. Ended
5-31-1939
5-31-1940
5-31-1941
5-31-1942
5-31-1943
Gross sales
$46,755.78
$74,973.50
$81,672.70
$117,383.92
$133,281.06
Cost of sales
21,957.96
32,292.99
31,017.10
55,239.80
94,487.28
Gross profit
$24,797.82
$42,680.51
$50,655.60
$ 62,144.12
$ 38,793.78
Other income
6.24
312.07
231.77
2,673.92
4,216.48
Total income
$24,804.06
$42,992.58
$50,887.37
$ 64,818.04
$ 43,010.26
Officers' salaries
2,500.00
4,375.00
10,800.00
18,000.00
24,000.00
Other deductions
25,654.53
38,242.74
39,588.95
39,774.60
18,237.56
Total deductions
$28,154.53
$42,617.74
$50,388.95
$ 57,774.60
$ 42,237.56
Net income or (loss)
($ 3,350.47)
$ 374.84
$ 498.42
$ 7,043.44
$ 772.70
*167 The percentage of the above cost of sales to gross sales and of the above officers' salaries to gross sales are as follows: Percentage
Percentage
Officers'
Cost of Sales
Salaries to
Year Ended
to Gross Sales
Gross Sales
May 31, 1939
46.96%
5.35%
May 31, 1940
43.07%
5.84%
May 31, 1941
37.98%
13.22%
May 31, 1942
47.06%
15.33%
May 31, 1943
70.89%
18.01%
For the years ended May 31, 1942 and May 31, 1943, the Commissioner in his deficiency notice adjusted the net income reported for those years are as follows: May 31,
May 31,
1942
1943
Net income as reported
$ 7,043.44
$ 772.70
(a) Officers' salaries dis-
allowed
6,000.00
12,000.00
(b) Partnership income
13,671.91
(c) Capital stock tax
(350.00)
187.50
(d) Depreciation
267.10
(47.68)
(e) Bottle deposit
1,000.00
Net income as adjusted
$12,960.54
$27,584.43
Petitioner contests adjustments (a) and (b). Eliminating these two items from the above adjustments, the uncontested net income for the years ended May 31, 1942 and May 31, 1943 is $6,960.54 and $1,912.52, respectively. On the returns for the five years ending May 31, 1943, petitioner *168 reported a total tax due for each year as follows: May 31, 1939
None
May 31, 1940
$ 46.86
May 31, 1941
74.02
May 31, 1942
1,894.16
May 31, 1943
156.62
After deducting these taxes from the uncontested net income of petitioner for the five years ending May 31, 1943, petitioner earned the following percentages on its capital stock: Percentage
Net Income
Earned on
or (Loss)
Stock
Year Ended
After Taxes
Capital
May 31, 1939
($3,350.47)
None
May 31, 1940
327.98
3.28%
May 31, 1941
424.40
4.24%
May 31, 1942
5,066.38
50.66%
May 31, 1943
1,755.90
17.56%
Sherman graduated from the University of Iowa in 1920 with a degree in business administration. While at the university he studied chemistry for three years. For three years immediately prior to the organization of petitioner, Sherman was engaged in the wholesale gasoline and oil business at Wichita Falls, Texas. His net income as reflected by his individual income tax returns filed for the years 1936, 1937 and 1938, was $5,619.77, $6,027.27 and $8,579.99, respectively. In the early part of 1937 Sherman and Barnes began their efforts to obtain a Barq's franchise for *169 the Dallas territory, which resulted in the above mentioned agreement dated September 16, 1937. From the time Sherman began working on the matter in 1937, he drew no salary from petitioner until August, 1939, although he spent from two to four days each week in Dallas in the interest of petitioner's business. In addition, he paid out some $3,000 or $4,000 for assistance in the running of his individual business in Wichita Falls. Barnes organized and was engaged in the drive-in grocery and ice business in Wichita Falls from 1935 through 1937. His earnings in this business amounted to about $3,500 to $4,500 per year. For about 10 years prior to that time he operated a filling station and wholesale gasoline business in Wichita Falls. Prior to 1925 he spent nearly two years with the M.K. & T. Railroad Company as an apprentice in their machinery department. He was an experienced mechanic. From August 1937 until May 1938, Barnes was engaged in the preliminary activities of organizing petitioner, during which time he drew no salary. In the first corporate fiscal year he drew a salary from petitioner of $2,500. He installed petitioner's plant and was primarily responsible for keeping the *170 plant in operating condition. In the early part of 1942 bottle crowns were sharply restricted due to the war and it was necessary for petitioner to use a large number of reprocessed crowns. Barnes devised a machine for the purpose of reshaping and reconditioning these crowns in order to expedite production. This machine was used for only three or four months. Shortly after they started using Barnes' machine several firms began rehabilitating caps better and cheaper than could be accomplished by the use of the Barnes machine and it was cheaper to buy the caps than it was to rehabilitate them with Barnes' machine. Sherman worked out a chemical process by which the crowns were treated with a mixture of paraffin and highly refined distillate which enabled them to slide down a chute more rapidly. This process was used until after the war when petitioner was able to buy all the new crowns it needed. The business reputation of both Barnes and Sherman among the soft drink bottling industry in the Dallas territory is good. Barnes and Sherman gave their full time to petitioner, working from 12 to 14 hours each week day and from 6 to 8 hours on Sunday. They were available and subject to *171 call at all hours. No vacations were taken by either of these men during the taxable years here involved. These officers gave their personal credit for the benefit of petitioner, endorsing its notes at the bank on all loans. At no time was petitioner able to borrow money without the personal endorsement of Barnes and Sherman. It was not necessary for either officer to give much time to the distribution of the product since there was a market for all of the drinks that could be produced. The difficulty lay in producing sufficient drinks to meet the public demand rather than in selling the drinks produced. No attempt was made by petitioner to get new customers subsequent to June 1942 as its old customers would buy all of the drinks it could bottle. In fixing the salaries paid to Barnes and Sherman by the directors of petitioner, consideration was given to the low salaries received by them in previous years. We find as an ultimate fact that $8,000 is a reasonable allowance for salaries or other compensation for personal services actually rendered to petitioner by its officer Barnes during each of the taxable years ended May 31, 1942 and May 31, 1943. We make a like finding as to Sherman. *172 On June 19, 1942, a special meeting of the board of directors of petitioner was held for the purpose of discussing the possible dissolution of petitioner. The minutes of this meeting state in part that: The Chairman expressed to the board of directors his desire to dissolve the corporation and set out the following reasons for so doing: viz: That this being a small company and closely owned by but two stockholders, there was required of a corporation too many reports to be made to various state and national government offices, that there were too many taxes and too high taxes placed on corporations and this being a small corporation doing a small business the taxes were all out of proportion to its earnings and the benefits derived from being incorporated did not justify the cost. He further pointed out that the company was formed to give the two stockholders a means of livelyhood [livelihood] and not as an investment for a large number of stockholders or the general public. He further pointed out that from time to time, had the company been a partnership it would have been possible to have taken on other franchise drinks without violating the Barq's franchise held by the corporation. *173 He further reviewed various complaints made by representatives of Barq's Inc. on the use of California Fruit Growers Exchange Orange and Lemon drink being bottled by the company in place of bottling Barq's Orange and lemon. He stated that Barq's orange and lemon oxidized too rapidly and would not keep well and gave this as the reason for not using Barq's orange and lemon. Then he pointed out that this was a direct violation by the corporation of its franchise. He further stated that if the corporation was dissolved and a partnership formed to take its place the partnership could bottle California Fruit Growers Exchange orange and lemon under partnership name without violating the franchise of Barq's, and the partnership could take on other franchise drinks and market them without violating the Barq franchise and do business other than the bottling of drinks. The corporation charter prohibits certain contracting business anticipated at this time, which business could be handled by a partnership, and under partnership form of operation the company could do a greater volume of business and a greater variety of businesses than done by the corporation and could thereby hedge itself against *174 war time restrictions that might cause the bottling business to become so unprofitable the operation of it could not be continued. C. E. Sherman agreed with the Chairman that the corporation form of business necessitated too much bookkeeping for a business the size of the company and that taxes on the corporation were too high for the earnings of the company and that the corporation form of operation placed to much restriction at this time on the type of business done. He pointed out however that the Barq's franchise was made to the corporation and was not transferable. That the corporation was formed for the purpose of holding the Barq's franchise thereby making it possible to sell the business without the necessity of securing from Barq's Inc. permission to do so and the sale of the corporation did not involve the transfer of the franchise. He pointed out that if the corporation were dissolved the franchise would cease to exist and it would be impossible to transfer the franchise from the corporation to a partnership except by securing such authority from Barq's Inc. and there was no certainty that such authority could be secured for the reason that it would be to Barq's Inc. disadvantage *175 to do so. C. E. Sherman then suggested that some other method be found or at least investigated to relieve the tax burden and further make it possible to secure additional franchises and engage in other lines of business that would increase the volume of business and form a hedge against curtailment of the bottling business due to war. A General discussion of the whole situation floowed and at the suggestion of H. J. Peters it was decided that the dissolution of the corporation be taken under advisement by the directors until the matter could be more thoroughly investigated whereupon it was RESOLVED to hold the matter of dissolving the corporation in abeyance for further study. On July 6, 1942, a special meeting of the board of directors of petitioner was held for the purpose of further considering the dissolution of petitioner and the forming of a partnership. The minutes of this meeting state in part that: The Chairman stated that he had given the matter of dissolving the corporation very careful consideration and had concluded that it would be inadvisable for the reason that the corporation held the Barq's franchise, that the franchise was not transferable and that there was *176 no certainty that Barq's Inc. would grant a new franchise to a partnership for the reason that it would not be to their advantage to do so; that if it were possible to get Barq's Inc. to grant a new franchise to a partnership the partnership could not at any time sell the business if they so desired without permission from Barq's Inc., the business would have no value as a going business without the franchise and would therefore be of little value and the business would therefore be at the mercy of Barq's Inc. as to furture [future] ownership and operation therefore jeopardizing the future value as well as the present value of the business. Upon motion duly made and seconded it was RESOLVED that the corporation shall not be dissolved and shall continue business as heretorfore [heretofore]. The Chairman pointed out to the meeting that the stock holders could form a partnership to distribute Barq's products and this partnership could secure and distribute other franchise drinks, could engage in other types of businesses as desired without violating the Barq's franchise held by the corporation and without violating the corporations [corporation] charter. He pointed out that *177 the corporation could sell its Barq's merchandise to a partnership to distribute without violating its franchise. He also pointed out that if the corporation did this it would have no further need for its trucks and distributing equipment but the distributing equipment could be leased to the partnership on a monthly rental basis for a sufficiently adequate amount to compensate the corporation therefor. Upon motion made and duly seconded it was unanimously Resolved that should a partnership be formed by the stock holders of the corporation, said corporation would lease the distributing equipment such as trucks and other assets held by it for such distributing purposes at adequate price or prices to be agreed upon at such time. It was further resolved that the corporation would sell its merchandise to said proposed partnership at prices to be agreed upon from time to time. On August 1, 1942, Barnes and Sherman organized a partnership known as Barq's Distributing Company, which took over the sales distribution in Dallas County and a part of Kaufman County. No written partnership agreement was drawn at that time as these men had been associated for a long time, knew each other well, *178 and did not consider it necessary to reduce their agreement to writing in order to make it legal. However, on August 12, 1942, they filed with the County Clerk of Dallas County, the statutory certificate of registration in the assumed names record showing the name of the partnership and the persons owning it. At the time petitioner was incorporated Barnes and Sherman would have preferred to operate as a partnership had it not been for the fact that complications might have arisen in the event they subsequently desired to transfer the "franchise" to some third person. Paragraph 9 of the above mentioned written agreement dated September 16, 1937 provided that: (9) It is further agreed that neither this contract nor any part of the territory herein described shall be assigned, transferred or conveyed, in whole or in part, without the written consent of the party of the first part. By operating as a corporation Barnes and Sherman could have sold petitioner's stock in the event they subsequently desired to sell their interests to some third person. Also, due to the limited capital available Barnes and Sherman were not able to operate the distributing end as a separate business at *179 the beginning and their bankers advised against it. Barq's Distributing Company built an office in the same building occupied by petitioner, and opened a separate set of books and bank account. The books and records were kept by H. T. Gersch who was also bookkeeper for petitioner. He devoted about one-third of his time to the partnership and two-thirds to the corporation. His salary was paid by petitioner but one-half thereof was charged to the partnership. A supply of sales invoices was purchased by the partnership from petitioner and a rubber stamp was used to strike out the corporate name. The partnership leased nine trucks from petitioner at a total rental of $315 per month which was on the basis of $35 per month for each truck. All gas, oil and upkeep of the trucks were paid by the partnership. The truck insurance coverage was transferred from petitioner to the partnership when this lease arrangement was made. The partnership used the telephone of the petitioner whenever it was necessary. The partnership employed its own men, kept separate payroll records, and reported them separately for the purposes of social security and state withholding and unemployment taxes. Separate *180 employer account numbers were assigned to the partnership by the Social Security Board and by the Texas Unemployment Compensation Commission. The contribution rate fixed for the partnership by the Texas Unemployment Compensation Commission was 2.7 percent whereas the rate for petitioner was one percent. A Federal partnership return of income was filed on a calendar year basis for the partnership covering its operations from August 1, 1942 to December 31, 1942. The partnership profits were included in the individual income tax returns filed by the partners. Petitioner has always made a practice of selling its distributors at a lower price during the winter months as compared to the prices it charged during the summer months. During the taxable years here involved and shortly prior thereto and thereafter, these prices per case were as follows: Name of Distributor
Barq's Distribut-
Period Covered
McCarley
Brown
ing Co.
1941: March 6 to April 3
$.35
$.35
April 10 to May 30
.45
.45
May 31 to October 31
.55
.55
November 3 to November 29
.50
.50
December 12 to December 31
.45
.45
1942: January 1 to July 2
.45
.45
July 9 to July 31
.55
.55
August 1 to October
.55
(1)
$.525
November 1 to December 31
.55
.45
1943: January 1 to May 31
.55
.45
June 1 to December 31
.55
.50
(1) Brown went into military service and McCarley took over his territory.
*181 The reasons for selling to the partnership at a price less than that charged other distributors were: (1) volume of sales to the partnership; (2) valuable services rendered to petitioner by the partnership in procuring bottle crowns for re-processing; and (3) prompt return of bottles and cases which were acutely scarce items. The partnership, Barq's Distributing Company, was in fact a valid and bona fide partnership. Its profits were taxable to the partners and no part of such profits were taxable to petitioner. Petitioner did not file an excess profits tax return for the fiscal year ended May 31, 1943 until November 10, 1943. Its income as shown on the income tax return filed was not of sufficient amount to require the filing of such excess profits tax return. It was advised by its tax counsel that no such return was required to be filed and petitioner relied solely on this advice. The delinquent return was filed only after the internal revenue agent had made an audit of petitioner's tax return and called its attention to the delinquency. Petitioner's failure to file such return within the time required was due to a reasonable cause and was not due to willful neglect. Opinion
*182 BLACK, Judge: There are three issues in this proceeding, namely, (1) whether $12,000 represents a reasonable allowance for officers' salaries for each of the fiscal years ended May 31, 1942 and May 31, 1943; (2) whether the net income of $13,671.91 returned by the partnership was in fact the income of petitioner and properly reportable by it; and (3) whether petitioner is subject to a penalty for failure to file the excess profits tax return for the taxable year ended May 31, 1943 within the time prescribed by law. We will consider these issues in the order stated. Issue (1). We are here presented with a question of fact. Petitioner contends it is entitled to deduct under section 23 (a) (1) (A) of the Internal Revenue Code[1] a total of $18,000 as officers' salaries paid to Barnes and Sherman for the fiscal year ended May 31, 1942, and a total of $24,000 for the fiscal year ended May 31, 1943. The respondent in determining the deficiencies herein determined that a total of $12,000 represented a reasonable allowance for each year and that the amounts claimed by petitioner in excess of a total of $12,000 for each year should be disallowed as representing a *183 distribution of earnings. This determination is presumed to be correct and the burden is upon petitioner to show otherwise. Botany Worsted Mills v. United States, 278 U.S. 282. We think petitioner has met this burden in part and we have found as an ultimate fact that based upon all of the evidence a total of $16,000 for each year represents a reasonable allowance for salaries or other compensation for personal services actually rendered to petitioner by its two officers Barnes and Sherman during the taxable years in question. The evidentiary facts supporting this ultimate finding are set out in our findings of fact and need not be repeated here except to note that petitioner has shown that its officers put in unusually long hours during these years, took no vacations, and were paid inadequate salaries in earlier years. Petitioner has not shown what other corporations similarly circumstanced were paying their officers for like or similar services. Neither Barnhardt nor Bryant who were witnesses for petitioner was conducting his own bottling business under a corporate form and neither of these witnesses had any information as to salaries paid by corporations comparable *184 to petitioner. Petitioner's two officers, Barnes and Sherman, appeared to be men of ability in their field and evidently worked hard and were competent. However, the business of petitioner was not of sufficient magnitude, we think, to justify the salaries claimed by petitioner. We hold that for each year here involved petitioner is entitled to deduct $8,000 for each of its two officers, or a total of $16,000 as representing the "reasonable allowance" provided for in the statute. Issue (2). We have previously stated the respondent's reasons given in his notice of deficiency for including in petitioner's income for the fiscal year ended May 31, 1943, the entire net income of Barq's Distributing Company for the period from August 1, 1942 to May 31, 1943, in the amount *185 of $13,671.91. In his brief he amplifies these reasons by contending primarily "that the so-called partnership was in fact a sham completely lacking in substance or business purpose." In support of this contention he relies upon such cases as Groves v. Commissioner, 99 Fed. (2d) 179; Griffiths v. Helvering, 308 U.S. 355; Higgins v. Smith, 308 U.S. 473; and Commissioner v. Court Holding Company, 324 U.S. 331. We do not agree with the respondent that Barq's Distributing Company was a sham. We think the company was a valid, legitimate, bona fide partnership and should be recognized as such for tax purposes and we have so found in our findings of fact. The reasons for its creation are fully covered in our findings which show that even before petitioner was incorporated, Barnes and Sherman would have preferred to operate wholly as a partnership; that the main reason for organizing petitioner in the first place was to hold the franchise from Barq's, Incorporated; that petitioner's charter was accordingly specifically limited "to bottle carbonated water, soda water and soft drinks" with no provision for distribution; that due to the small *186 capital possessed by Barnes and Sherman the latter was advised by their bankers to have but one organization, namely, petitioner, and let it also distribute the drinks except for a few small distributors other than Barnes and Sherman; that on June 19, 1942 and again on July 6, 1942, Barnes and Sherman seriously considered dissolving petitioner but concluded against the dissolution at that time "for the reason that the corporation held the Barq's franchise" which was not transferable; and that on August 1, 1942, Barnes and Sherman decided and agreed to organize a partnership to take over the distribution of the soft drinks then being conducted by petitioner. Thereafter the distribution end of the business was conducted separately by the partnership, separate books of account were kept and the partnership was conducted in regular form. See Seminole Flavor Company, 4 T.C. 1215. In his brief the respondent did not cite nor argue directly the effect, if any, of section 45 of the Internal Revenue Code. [2] In this connection petitioner contends that under this section the respondent had no authority to allocate in toto the income of the partnership to *187 petitioner unless, in fact, there was no genuine partnership in existence. In support of this contention petitioner relies upon our decisions in Briggs-Killian Company, 40 B.T.A. 895, and Seminole Flavor Company, supra. As indicated above, we hold that the instant partnership which was created on August 1, 1942 was and is a valid and bona fide partnership. Did then the respondent err in allocating the entire net income of the partnership to petitioner? We think he did. Section 19.45-1 of Regulations 103 and section 29.45-1 of Regulations III provide with respect to section 45 that "It is not intended (except in the case of the computation of consolidated net income under a consolidated return) to effect in any case such a distribution, apportionment, or allocation of gross income, deductions, or any item of either, as would produce a result equivalent to a computation of consolidated net income under section 141." Assuming the correctness of our holding above that the Barq's Distributing Company is a genuine partnership, it is our opinion that the allocation of the entire net income of the partnership to petitioner is directly contrary to the holding of the *188 above regulations. If the respondent had determined that because of the difference in price between what petitioner charged the partnership and what petitioner charged its other distributors for its bottled goods, that some portion of the gross income of the partnership should be allocated to petitioner to make up this difference, we might have an entirely different situation. The respondent, however, is content to rely upon this difference in price as one of the factors, which he contends, indicates that the partnership was a sham. In view of our holding above that the partnership was real, we need not again discuss this point except to say that in our opinion the reasons set out in our findings for this difference in price appear to be reasonable under all the circumstances. *189 We think the facts of the instant case bring it within the ambit of Seminole Flavor Company, supra, and that our holding in that case is controlling here. We, therefore, decide this issue for the petitioner. Issue (3). Did the respondent err in adding a penalty of 15 percent for failure to file the excess profits tax return for the taxable year ending May 31, 1943, within the time prescribed by law? The material provisions of section 291, I.R.C. are in the margin. [3] Under this section the penalty does not apply if "it is shown that such failure is due to reasonable cause and not due to willful neglect." In our findings we have found such to be the fact. We hold, therefore, that no penalty should be added. C. R. Lindback Foundation, 4 T.C. 652, affirmed per curiam, Fed. (2d) , decided October 17, 1945.
*190 Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩
2. SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS. In any case of two or more organizations, trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
3. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * *↩