OPPENHEIM'S, Inc. v. KAVANAGH, Collector of Internal Revenue.
Nos. 6644, 6779.

United States District Court
E. D. Michigan, S. D.
March 6, 1950.

Rosenburg, Painter & Davidson, Jackson, Michigan, for plaintiff.

Edward T. Kane, District Attorney, Roger P. O'Connor, Ass't. District Attorney, Detroit, Michigan, for defendant.

PICARD, District Judge.

Plaintiff brings two actions, now consolidated, for recovery of additional taxes and interest paid under deficiency assessments for the years from 1940 through 1944. Our findings are based on the stipulation entered into by the parties and a hearing before us. Five questions are presented and facts pertinent will be discussed under separate topics.

### I. Payment to Isaac C. Levy.
#### Statement of Facts

Back in 1906 Isaac C. Levy and L. E. Oppenheim entered into a retail clothing business partnership in Jackson, Michigan, which continued until the death of Mr. Oppenheim in 1923, when Earl H. Spiesberger, who had first become associated with the firm in 1920 took Mr. Oppenheim's place. Plaintiff was incorporated in 1928 with Mr. Levy as president.

In 1935 after financial reverses the equity of Levy in plaintiff was reduced to one share of common stock out of the 300 outstanding. Prior thereto Levy owned all the preferred stock (750 shares).

Four years later, August 2, 1939, plaintiff and Levy entered into a contract whereby the latter was employed at $100.00 weekly, payable for 450 weeks. In the event of Levy's death before the named period, payments for the remainder of the 450 weeks went to his estate. Under the con-

tract Levy agreed among other things to be available on reasonable notice for consultation in regard to conduct of the business; he was expected to render some service in the store; not to compete in a rival business; and to permit the use of his name to strengthen the public's impression of his continued active association with plaintiff. At the time he was 64 years old and had a life expectancy of 12 years.

Levy was a prominent Jackson citizen, member of many organizations and clubs and well known throughout the community, with valuable contacts in the retail field, particularly with plaintiff's regular customers, and prior to the contract date accounted directly or indirectly for about one-third of plaintiff's sales and about one-fifth thereafter. From 1939 on he acted as floorwalker and outside salesman and adhered to the covenants of his contract. Levy's death occurred before the contract expired.

Claimed deductions by plaintiff for payments under the contract as necessary business expenses were entirely disallowed by the Commissioner of Internal Revenue for the fiscal years ending 1940, 1941, 1942, 1943 and 1944.

In support of Commissioner's action, defendant contends that the contract was a subterfuge to compensate Levy by $45,000 for the loss of his equity in the business in 1934, advancing many arguments that this must be true, among them that Levy drew as much salary on part time as he did on full time.

## Conclusions of Law

Under the Internal Revenue Code, § 23(a) (1) (A), 26 U.S.C.A. § 23(a) (1) (A), deduction from gross income of "a reasonable allowance for salaries or other compensation for personal services actually rendered" is permitted and what is a reasonable salary is a question of fact. Burden of proof is on petitioner. H. Levine & Bros. v. Commissioner of Internal Revenue, 7 Cir., 101 F.2d 391; Miller Mfg. Co. v. Commissioner of Internal Revenue, 4 Cir., 149 F.2d 421.

Defendant failed to introduce any evidence to prove his contention and we find that the salary paid Levy was reasonable. True, he was 64 years of age at the time the agreement was entered into and the contract did not call for full time services. Nevertheless we take into consideration his broad acquaintance in the community, his wide experience in the retail field, and his undoubtedly great knowledge of the operations and policy of petitioner. Such an arrangement to keep strong competition from starting in business, to keep an old employee in good humor and to make an impression upon the public is not unusual and of course not against public policy. The success of many a business has been lost on less attention to such details affecting public relations. We find further that Levy was worth at least $100 a week to taxpayer.

Defendant's hypothesis that the contract was in fact delayed consideration for losses sustained by Levy in the 1934 reorganization is without merit. It is mere conjecture and we refuse to accept it in the absence of any proof in support thereof.

Nor are we unmindful of the value of Levy's covenant not to compete which defendant urges may not be considered for the years from 1940 through 1942, citing Real Estate Land Title & Trust Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542. Defendant's contention is inapplicable. Claims for refund filed by taxpayer for the years in question all had reference to the possible danger that Levy would compete with plaintiff causing a loss to the corporation in excess of his salary. As for Collector's position that payments to Levy were for good will, we find that a contract of employment with an individual for his skill, acquaintance and experience is not a purchase of good will. Providence Mill Supply Co., 1925, 2 B.T.A. 791. Such agreement not to compete is of value and may be recognized as a factor in determining reasonableness of salary. Black River Sand Corporation v. C. I. R., 1929, 18 B.T.A. 490.

In the light of the foregoing, we hold that the salary paid Levy for the years from 1940 through 1944 is deductible from gross income as a business expense.

## II  Fire Insurance Proceeds.
### Statement of Facts

Plaintiff's premises were completely destroyed by fire on December 21, 1942, but it resumed merchandizing March 1943, after leasing other and smaller quarters than those destroyed. By February 1948 it was able to replace its original premises and moved into its new building at that time.

As a result of the complete destruction caused by the fire plaintiff received a total of $113,621.08 on two policies of fire insurance covering merchandise, furniture, fixtures and leasehold improvements. The Commissioner determined that of the $8,644.44 proceeds paid with reference to leasehold improvements, $4,033.97 represented gain to plaintiff over the adjusted basis of the leasehold improvements, and that $1,772.56 of that amount had not been expended in acquiring similar property. This amount was therefore taxed as income and capital gain.

Plaintiff seeks to avoid this on the theory that it had attempted to establish a replacement fund in conformity with the statutory requirements, Internal Revenue Code, § 112(f), 26 U.S.C.A. § 112(f). Shortly after receipt of the fire insurance proceeds and from the business interruption insurance polices (to be discussed below), plaintiff invested the amounts not already expended for replacement in securities and earmarked the sums as a replacement fund. Ultimately all but a fraction of the money in this fund was expended to pay the deficiencies here in suit, and spent for the new building, furniture and fixtures.

By letter of October 18, 1943, the Commissioner granted plaintiff permission to establish its replacement fund and required bond, advising plaintiff that such replacement fund was ineffective until the bond (of $1300.00) was approved. However, the bond submitted by plaintiff was rejected for failure to comply with the requirements and second application made. Because there had been no decision as yet as to the taxability of the business interruption insurance proceeds (from two $30,000 policies) which were then placed in the same fund, and because the Commissioner was under the erroneous impression that the earlier replacement funds had been entirely expended, plaintiff was advised by letter of August 30, 1944, that no action would be taken until the question of business interruption insurance proceeds was determined. Plaintiff attempted to correct the misapprehension regarding expenditure for replacement of leasehold improvements but apparently the correspondence ceased at that point. We are squarely confronted with the question of whether failure to get formal approval of the replacement fund bars plaintiff from claiming refund for taxes on the sum of more than $1700.00.

### Conclusions of Law

In M. J. Caldbeck Corporation v. C. I. R., 1937, 36 B.T.A. 452, similar gain was held taxable on the ground that not only was no replacement fund established, but that it was "plain that in this case there has been no compliance, nor any gesture towards compliance, with the regulations."

But in Winter Realty & Construction Co. v. Commissioner, 2 Cir., 149 F.2d 567, a replacement fund was established and the Commissioner advised thereof. Then the letter of notification was lost by the Commissioner and still the court held that the replacement fund was never properly set up, ruling against taxpayer.

██ This decision is squarely against the petitioner. In the case at bar there is no question that plaintiff attempted to set up a replacement fund—it filed the requisite form and posted bond, which however proved to be unacceptable. It then added to the same fund the moneys which it had received from its business interruption policies. There followed an exchange of letters but the facts in the case at bar are not as impelling as those in the Winter case. In that case the fault was entirely chargeable to the Commissioner. In the case at bar it was the plaintiff who added the new element and as a result the new distinction. If the taxpayer was ruled against in the Winter case—our only authority—surely he should receive the same treatment in the case at bar. Under the conclusion of the Winter case, therefore, which demands precise compliance with the letter of both

statute and regulation, we hold that the amount of $1772.56 in question was taxable gain.

### III  Business Interruption Insurance Proceeds.

#### Statement of Facts

At the time of the fire plaintiff carried two business interruption policies, in the amount of $30,000.00 each, in uniform standard Michigan form for mercantile risks. The measure of recovery under the policies was "reduction in 'gross earnings' directly resulting from such interruption of business less charges and expenses which do not necessarily continue during the interruption of business." Gross earnings are defined in the policy as "total net sales less cost of merchandise sold, plus other earnings derived from the operation of the business." As a result of the fire, plaintiff was paid an aggregate of $58,000.00 as a compromise settlement, the adjuster arbitrarily determining that plaintiff would be out of operation some nine months until September 1943, to arrive at that figure. The Commissioner determined that the entire amount, less $461.77 for legal expenses, was taxable income having been received as compensation for loss of profits for 12 months following date of the fire. He apportioned the proceeds to the two fiscal years involved—December 21, 1942 (date of fire) through January 31, 1943; and February 1, 1943 through January 31, 1944. Thus $13,377.64 was added to plaintiff's income for 1943 and $44,160.59 for 1944. As we mentioned earlier in this opinion, plaintiff sought to earmark these receipts under Section 112(f) in his second attempt to establish a replacement fund (on which no action was taken by Commissioner).

Plaintiff disputes the Commissioner's ruling that the policies were intended to insure it against loss of profit and contends that the proceeds represented compensation for loss of property rights and as such were also subject to the involuntary conversion provisions of Section 112(f). If the proceeds are treated as income, plaintiff adds, only a portion should be taxed to the years of 1943 and 1944.

Bearing the facts and contentions of the parties in mind, we turn to the law.

#### Conclusions of Law

Plaintiff cites Piedmont—Mt. Airy Guano Co., 1926, 3 B.T.A. 1009, where the Board held that proceeds of a use and occupancy policy determined by application of a per diem rate were proceeds from an involuntary conversion. This case was decided very shortly after The International Boiler Works Co., 1926, 3 B.T.A. 283, which was contra. There the Board said: "The argument (insurance was on a property right) is too attenuated to merit lengthy discussion. * * *"

In the Piedmont case, supra, the Board relied on Jacksonville Oil Mills v. Stuyvesant Ins. Co., D.C.1925, 3 F.2d 1006, which was concerned with construction of a policy. The insurance was held to be on a property right, the right to "the use and enjoyment" of property.

In addition, Flaxlinum Insulating Co., 1926, 5 B.T.A. 676; Thorrez & Maes Mfg. Co. v. American Central Ins. Co., D.C. 939, 32 F.Supp. 110, a question of insurer's liability decided in this district, and Williams Furniture Corporation v. C. I. R., 1941, 45 B.T.A. 928, are also cited by plaintiff. In this later case, the court in finding for taxpayer where the rate was per diem, distinguished between the two principal types of use and occupancy insurance and this distinction we believe is important. It said in 45 B.T.A. at page 936:

"It seems to be well settled that, if under the terms of a use and occupancy insurance contract the taxpayer is insured against actual loss sustained of net profits in the business, then it is true that the proceeds received under such a policy are not proceeds of an involuntary conversion, but are income in the same manner that the profits for which they are substituted would have been." Citing International Boiler Works case, supra, and Miller v. Hocking Glass Co., 6 Cir., 1935, 80 F.2d 436.

"If, however, the contract of insurance does not insure against the loss of net profits, but is a contract to pay the insured a flat per diem allowance for the loss of the use and occupancy of the property destroyed by

fire, measured from the date of the occurrence of the fire to the time when the destroyed property can, with ordinary diligence, be replaced and operations resumed, then upon receipt of the proceeds under such a policy no gain or loss should be recognized, providing the proceeds are expended in the acquisition of other property similar or related in service or use to the property destroyed." Defendant relies upon Miller v. Hocking Glass Co., supra, where liability was conditioned on actual loss of net profits plus fixed charges and expenses. The court said, 80 F.2d at page 437:

"The insurers agreed to be liable for the actual loss sustained 'consisting of net profits' measured by the profits of the preceding year. The purpose expressly stated was to insure anticipated earnings which might be interrupted by the destruction of the plant, earnings to arise out of 'the business which is thereby prevented.' * * *

"The policies offered the usual business interruption insurance, which might better be termed earnings insurance. Under such a policy the insured is protected in the earnings which it would have enjoyed had there been no interruption of business."

The court concluded that since earnings would have been taxable, insurance proceeds in lieu thereof are equally subject to tax.

Reference to the policies in question indicates that recovery was neither measured strictly by per diem damages nor by net income plus continuing expenses. However, we conclude that the rule of the Hocking Glass case, supra, applies. On the facts two things tend toward that conclusion. First, the policies state: "In determining 'gross earnings' due consideration shall be given to the experience of the business before the fire and the probable experience thereafter. * * *" clearly an indication, we believe, that income experience was to be a factor in determining recovery and not mere per diem idleness due to fire. Second, testimony was offered to show that these gross earnings policies were the counterpart of the net earnings policies covered by the Hocking Glass case, supra. It was explained that the difference in terminology arose because of differences in accounting practices used in mercantile establishments as against industrial concerns using the "net earnings" insurance. An example showed the two formulæ to reach identical results.

Without relying on this last argument hypothetically demonstrated, we nevertheless hold that Hocking Glass case applies to the situation before us, first, because the facts at bar are more nearly parallel to those of the Hocking case than to the cases following the reasoning in the Piedmont case, supra, and, second—and perhaps parenthetically—because application of the rule of the Hocking case on use and occupancy policies seems more realistic in the tax field, remembering that the Piedmont rule depends on cases where the primary question was one of insurer's liability and a construction was sought to fix such liability.

We also reject plaintiff's alternative contention that the proceeds should be prorated over all the years it was out of its original premises. The $58,000.00 was received in lieu of income plaintiff would have received the first year after the fire and income is taxable for the year in which it is received. Commissioner of Internal Revenue v. Lyon, 9 Cir., 1938, 97 F.2d 70. But prorating between the two fiscal years ending in 1943 and 1944 was proper under The International Boiler Works Co., supra.

Finally, we reject plaintiff's further contention that the receipts were "abnormal income" under Section 721(a) (1). Receipts in lieu of profits cannot be treated as abnormal income. See James F. Waters, Inc., v. Commissioner of Internal Revenue, 9 Cir., 1947, 160 F.2d 596.

Concluding, then, we hold that the proceeds on use and occupancy insurance contracts were properly taxed as income and properly allocated by Commissioner.

## IV  Assignment of Lease.

### Statement of Facts

Prior to the fire plaintiff had leased the basement of its original quarters to Schiff

Company and Clapp's Knitwear Store Inc., selling shoes and ladies' ready to wear. The basement was operated under the name of Oppenheim's Basement Store and held out to the general public as a unit of plaintiff's business. The quarters occupied March 1943, after the fire, were inadequate to accommodate the two companies formerly in the basement store but about a month later, in a lease dated April 8, 1943, plaintiff was able to secure additional premises for Schiff and Clapp's. By the terms of the lease, plaintiff agreed to pay $175.00 rental per month and all utility charges. The premises were sublet to Clapp's and Schiff. The subleases were on a percentage based on sales. Plaintiff assumed light and fuel charges. On April 15, 1943, plaintiff purportedly assigned its lease and sublease to Earl H. Spiesberger, its president. Lessor was notified of the assignment June 10, 1943, and the sublessees were similarly advised at about the same date. Net rental income of $5,374.24 was realized for the year ending January 31, 1944, and under Section 45 of the Internal Revenue Code, it was determined that this amount was taxable to plaintiff.

In resisting assessment, plaintiff contends that by its assignment Spiesberger assumed liabilities under the agreement and presumably, had there been a loss, would have borne it personally. But defendant insists that the assignment was merely in furtherance of a scheme to reduce tax liability and emphasizes that the corporation continued to exercise supervision over the store and was responsible for collection of sales on account. Rent for the premises were paid by plaintiff and receipts from Schiff & Clapp's were carried in its own accounts and it was not until January 31, 1944, that the sublease account was closed from plaintiff's books to those of Spiesberger.

### Conclusions of Law

■ Once the Commissioner shifted income pursuant to Section 45, the burden of proof to establish error in the allocation is on taxpayer. Briggs-Killian Co., v. C. I. R., 1939, 40 B.T.A. 895. In that case Killian, general manager of taxpayer,

privately entered into a contract with a third party and the Board found that since separate books were kept and Killian bore risk of loss, the company should not have been taxed on Killian's profit. However, the Board indicated that if the individual had used the company's office force and equipment to perform the contract, it would have found for the commissioner. Seminole Flavor Co., 1945, 4 T.C. 1215, and Barq's Bottling Co., 1946, 5 T.C.M. 505, relied upon by plaintiff are not in point. Defendant cites Paxson v. Commissioner of Internal Revenue, 3 Cir., 1942, 144 F.2d 772, and Rudco Oil & Gas Co. v. United States, 1949, 82 F.Supp. 746, 113 Ct.Cl. 206. In the latter case a dividend in kind was paid by plaintiff corporation by assigning oil leases to its stockholders until each had received a specified amount of royalties. In sustaining an assessment on the corporation treating the lease rentals as taxable, the court held that this was merely assignment of future income. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; and Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655.

In the Paxson case, the dominant board member of a family owned corporation personally entered into contract which his corporation performed. Receipts were held taxable to the corporation.

■ It is apparent that the question before us, in the last analysis, resolves itself into one of fact. We consider the assignment colorable and open to the charge that the principal intent was to short circuit tax liability. Spiesberger owned 50 per cent of plaintiff's stock in his own name and all but one share of the balance jointly with his wife. Spiesberger did not perform any real services under the lease—the service of carrying credit was performed by the corporation. Spiesberger was incapable of personally performing a most important function tacit in the lease arrangement, that is, representing to the general public that Oppenheim's was behind the store. Furthermore, the sub-lease accounts were

carried on plaintiff's books. The company paid the expenses, a balance being struck at the end of plaintiff's fiscal year and closed out to Spiesberger's books.

Plaintiff's argument that as a result of the assignment the tax burden on Spiesberger was heavier than on the corporation is without merit. Plaintiff ignores the fact that were the assignment recognized, the aspect of double taxation would be avoided. Lum v. Commissioner of Internal Revenue, 3 Cir., 1945, 147 F.2d 356, is not in point. Although the assignment qua assignment might be valid, we need not recognize it if other aspects convince us (as they do here) that for tax purposes it was colorable.

As stated at the time of the hearing, no taxpayer should be encouraged into playing "fast and loose" with the possibility of taxes. This is what the taxpayer appears to be doing in this case. He had evidently assumed an attitude of "wait and see."

## V Equity Invested Capital.

### Statement of Facts

The last question presented by these cases is that of increased equity invested capital. Prior to reorganization of the corporation in 1934, the outstanding capital stock of the company was 10,000 shares of no par common of which Spiesberger owned 2500 shares, and 750 shares of $100.00 par preferred, all owned by Levy. At this time plaintiff was in serious financial difficulties. Among its creditors was a Jackson bank for the amount of $20,312.05, principal and interest, and Levy who had a claim for unpaid salary in the amount of $3,388.96. Spiesberger was able to buy the instrument held by the bank for $10,000.00 and he destroyed it. Levy had pledged his own stock holdings with the bank to secure a personal loan and Spiesberger obtained this stock and Levy's claim for back salary by paying the bank $1000.00. Other indebtedness was cleared up, all common was cancelled and preferred altered to 750 shares of common at $100.00 par of which 300 were issued. The reorganization meeting was held November 30, 1934 and a certificate of decrease of corporate stock was filed January 11, 1935. Of the new 300 shares of common issued to stockholders, Spiesberger was sole owner of 150, jointly owned 149 with his wife, and Levy received one share which he endorsed back in blank. The amount of the cancelled indebtedness was credited on plaintiff's books to surplus and no part was included in the taxable income.

As defendant expresses it, the issue is whether cancellation of indebtedness by Levy and Spiesberger constitutes money paid in for stock within the meaning of Section 718(a) (1) and (2) of the Internal Revenue Code, 26 U.S.C.A. § 721(a) (1, 2), so as to increase taxpayer's equity invested capital credit in computing its excess profits tax.

### Conclusions of Law

Plaintiff relies on three cases: Charles F. L'Hommedieu & Sons Co., v. C. I. R., 1927, 6 B.T.A. 41; Cohn-Goodman Co. v. C. I. R., 1927, 7 B.T.A. 475; and The Parisian, 1925, 2 B.T.A. 415. In the L'Hommedieu case, officers (who were sole stockholders in this closely held corporation) forgave unpaid salaries and received stock in lieu thereof. The Board held this constituted paid in capital. In the Cohn-Goodman case the Board held that a business practice whereby unpaid corporate profits went into a special surplus account where the sums were credited to accounts owing creditor-stockholders were loans and not invested capital. When, however, the sums were transferred to the capital account and stock issued therefor to the creditor-stockholders the Board held that the invested capital was thereby increased. In The Parisian, forgiveness of debts by stockholders was held to increase invested capital from the date of such forgiveness.

The foregoing cases support plaintiff's proposition that forgiveness of indebtedness by Levy and in effect by Spiesberger (by destroying the instrument he acquired without insisting on payment) serve to increase the equity invested capital.

Defendant, however, cites Liberty Mirror Works, 1944, 3 T.C. 1018 at page 1025 where the court said: "Where an indebtedness of a corporation is forgiven and canceled by stockholders under circumstances showing a purpose on their part to make an additional contribution to the corporation's capital and to increase their investment in the corporate enterprise, the amount of the canceled indebtedness has been recognized as an addition to invested capital."

The Board held that forgiveness by a director holding one share was not intended to be a capital contribution. 3 T.C. at page 1025 it said: "he did not intend to make a contribution to petitioner's capital so out of proportion to his investment."

But in the case at bar when Spiesberger paid Levy's indebtedness at the bank for $1000 he thereby procured the release of all rights to cumulated unpaid dividends in plaintiff's preferred stock (held entirely by Levy) and the forgiveness of unpaid salary owing Levy. Thus, an increase in equity was effected by a stockholder whose capital position was thereby greatly improved. We hold, therefore, that the debt forgiveness by Spiesberger, new owner of the Levy stock, cancellation of this stock, the unpaid dividends and salary, increased the equity invested capital. As to acquisition of the bank note by Spiesberger, we hold that the equity invested capital should be increased by the sum of $10,000, the amount which he paid to obtain the paper evidencing plaintiff's debt, from the Jackson bank. Spiesberger ended up dominant stockholder after reorganization and there can be no question that he benefited by the forgiveness and therefore increased his investment in the enterprise. Therefore, we hold that equity invested capital was increased by the amount of $11,000.

## VI Conclusion.

Pursuant to agreement, counsel will present the court with computation of tax in accordance with this opinion.