MARCALUS MANUFACTURING CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MARCAL PULP & PAPER, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61499, 61500. Filed September 30, 1958.

*Richard W. Wilson, Esq.*, for the petitioners.
*Henry L. Glenn, Esq.*, for the respondent.

FORRESTER, *Judge:* These consolidated proceedings involve deficiencies in income tax of the petitioners for the years and in the amounts as follows:

MARCALUS MANUFACTURING CO., INC.

| Taxable year ended | Deficiency |
|---|---|
| April 30, 1952 | $6, 271. 23 |
| April 30, 1953 | 63, 955. 13 |

MARCAL PULP & PAPER, INC.

| | |
|---|---|
| July 31, 1952 | $53, 461. 99 |
| July 31, 1953 | 55, 900. 00 |

Petitioner Marcalus Manufacturing Co., Inc., will hereinafter be referred to as "Marcalus." Petitioner Marcal Pulp & Paper, Inc., will hereinafter be referred to as "Marcal."

All issues concerning Marcalus have been conceded, consequently, it will suffice for us to enter a decision in Docket No. 61499 pursuant to Rule 50 of our Rules of Practice.

One issue remains to be decided in Docket No. 61500. Marcal contests two adjustments to its net income in the total amount of $125,000 for each of its taxable years ended July 31, 1952, and July 31, 1953. The question for our decision is whether Marcal received an amount includible in net income as the result of the receipt by Marcalus for its benefit of $125,000, which amount represents insurance proceeds paid to Marcalus in settlement of a blanket insurance claim arising out of a claimed accident to certain of Marcal's machinery, and if so, in which taxable year and the amount thereof.

### FINDINGS OF FACT.

Marcal, the petitioner in Docket No. 61500, is a corporation organized under the laws of the State of New Jersey. It is engaged in the manufacture of paper products and has its principal office at East Paterson, New Jersey. It is a wholly owned subsidiary of Marcalus. It maintains its books and accounts on an accrual basis and it filed its tax returns for the fiscal years ended July 31, 1952, and July 31, 1953, with the district director of internal revenue at Newark, New Jersey.

On March 22, 1952, Marcal and Marcalus were the owners of a policy of insurance which protected them, as their interest might appear, against the risks of certain types of losses. This policy of insurance, originally issued by the Mutual Boiler and Machinery Insurance Company (hereinafter referred to as Mutual) on May 10, 1949, and bearing No. 552–122, provided two types of coverage. The first type of coverage, known as "direct damage" coverage, provided that the insurer should pay the insured for loss of or damage to property of the insured directly caused by an "accident." The second type of coverage, known as "use and occupancy" coverage, provided that the insurer should pay to the insured the amount of actual loss sustained resulting from a partial or total prevention of business on the premises of the insured, caused once again by an "accident."

Several qualifying conditions affected the insurer's liability. First of all Mutual's liability for direct damage losses was limited to the "actual cash value" of the damaged property at the time of the accident, this amount to be "ascertained with proper deductions for depreciation." Second, Mutual's liability for use and occupancy

losses was limited to "actual loss sustained." Actual loss sustained was defined as meaning:

1. NET PROFIT * * *
2. FIXED CHARGES AND OTHER CONTINUING EXPENSES * * *
3. EXPENSES NECESSARY TO REDUCE LOSS * * *

In addition Mutual's overall liability for use and occupancy losses was limited to $459,756 and its overall liability per accident for direct damage losses was limited to $150,000.

On March 22, 1952, while this policy of insurance was in force, a 7-inch longitudinal crack appeared in the outer shell of a dryer roll (hereinafter referred to as the "old dryer roll") which Marcal used in its paper-making machine. Marcal immediately informed Mutual of this damage and Mutual sent its investigators to Marcal's factory.

After discussing the extent of the damage with Marcal's engineers, Mutual decided that the old dryer roll should be repaired. Mutual was of the opinion that it was not liable for the type of defect which had caused the damage. It, however, had found that as a business matter it was unwise to permit a damaged machine to stand idle while it contested its liability. It therefore elected to repair the damage to the old dryer roll.

Mutual repaired the damage by welding the crack within the period of grace permitted in the contract and Marcal resumed production. While the repair was not entirely successful, it permitted the paper machine to continue in service and, according to Marcal's production records, it soon obtained close to normal production averages and over a period of 3 years the production averages were greater than before the damage.

Following the damage to the old dryer roll the petitioners made an oral claim upon Mutual for reimbursements totaling $250,000. This blanket claim was thereafter, on July 25, 1952, supplemented with a written revised estimate of use and occupancy losses in which the controller of Marcalus listed such losses for the period of March 22, 1952–July 20, 1952, in the amount of $154,248.26.

In the ensuing negotiations between Mutual and the petitioners, Mutual contended that the damage to the old dryer roll had resulted from a gradual fatigue cracking of the metal, whereas the petitioners argued that the damage had resulted from a sudden cracking due to internal pressure. Presumably, the term "accident" was defined in the policy in such a way as to cover the latter type of risk whereas it would not cover the former type of risk.

These negotiations led, on August 6, 1952, to an agreed compromise wherein the petitioners' claim was settled for $125,000. No allocation of this amount was agreed upon by Mutual and the petitioners.

However, Mutual for purposes of its records and for purposes of State insurance reserve requirements allocated $25,000 to direct damage losses and $100,000 to use and occupancy losses. On August 13, 1952, Marcalus received a check in the amount of $125,000 from Mutual in satisfaction of their agreement of August 6, 1952. Marcalus received payment for the benefit of Marcal.

Following the damage to the old dryer roll the petitioners placed an order for a new dryer roll of a somewhat different design with the Messinger Bearing Company. It was intended that this dryer roll would be used to replace the damaged old dryer roll. Certain other accessory parts were ordered at the same time. These parts were necessary to install the dryer roll or were related dryer-element parts.

The new dryer roll was received by Marcal in the summer of 1955. The old dryer roll was removed from the paper machine in July or August of that year and the new dryer roll and the accessory parts were installed in its place. The cost of the new dryer roll was $65,000. Marcal expended an additional $27,886.61 in labor costs in installing the new dryer unit and $27,256.53 for accessory dryer parts, freight costs, and miscellaneous costs. The installation of the new dryer roll was completed in September of 1955 at a total cost of $120,143.14.

Upon receipt of the $125,000 referred to earlier, Marcal elected not to recognize gain as on an involuntary conversion of the old dryer roll and signified its intention in this respect in a letter dated July 8, 1954, to the district director of internal revenue at Newark, New Jersey. In this letter Marcal requested permission from the district director, pursuant to section 112 (f) (3) (B) (ii) of the Internal Revenue Code of 1939, for an extension of time to replace property involuntarily converted by the purchase of property similar or related in service. On July 22, 1954, in support of such request, Marcal's president stated, in a letter to the district director, that the amount of the insurance recovery was $125,000 and that a letter from the insurance company had allocated "$25,000.00 * * * to the direct damage coverage and $100,000.00 to the use and occupancy coverage." On the basis of this letter the district director, on August 10, 1954, granted an extension of time to December 31, 1955, within which Marcal could replace the converted property.

As of March 22, 1952, the old dryer roll had an adjusted basis of $31,666.67. It had been acquired in June of 1948 at a cost of $40,000.

In its amended income tax return for its fiscal year ended July 31, 1953, Marcal reported additional income in the amount of $4,652.49 as representing the difference between the insurance proceeds received

($125,000) and the amount claimed as expended in replacement of the damaged property ($120,347.51).[1]

In his notice of deficiency, respondent has treated the insurance proceeds received by Marcalus for Marcal's benefit in the following manner. As to both of Marcal's taxable years ended July 31, 1952, and July 31, 1953, respondent has allocated $100,000 of the insurance proceeds to "use and occupancy insurance proceeds" to be includible in income in accordance with the provisions of section 22 (a) of the 1939 Code. The remaining $25,000 of insurance proceeds has been allocated for both taxable years to "gain on involuntary conversion" to be includible in income as a gain from the involuntary conversion of property used in the trade or business, as provided in section 117 (j) of the 1939 Code, which gain is to be recognized pursuant to section 112 (f) (3) of the 1939 Code. Alternatively, respondent has treated the entire $125,000 of insurance proceeds as "gain on involuntary conversion" for both taxable years, to be includible in income as a gain from the involuntary conversion of property used in the trade or business as provided in section 117 (j) of the 1939 Code, which gain is to be recognized pursuant to section 112 (f) (3) of the 1939 Code.

Marcal's right to the insurance proceeds did not become fixed either in fact or in amount until August 6, 1952. The insurance proceeds are not includible in Marcal's net income for its taxable year ended July 31, 1952.

Insurance proceeds in the amount of $100,000 are allocable to use and occupancy coverage under the contract of insurance and are includible in Marcal's net income for its taxable year ended July 31, 1953, as a payment in lieu of net profits.

Insurance proceeds in the amount of $25,000 are allocable to direct damage coverage under the contract of insurance and are excludible from income since they represent a compensated loss and do not exceed the basis of the damaged property.

### OPINION.

Stated in its simplest terms the principal issue involved herein is whether a part of the total insurance proceeds is allocable to a reimbursement of Marcal's lost profits, or as otherwise stated use and occupancy losses, and if so, the amount thereof.

Before discussing the parties' arguments it should be mentioned that respondent now agrees that the petitioners' insurance claim was not settled nor was payment received prior to August 1, 1952. Respondent's determination insofar as it includes the insurance

---

[1] There is an unexplained discrepancy of $204.37 between the amount claimed as expended for a replacement dryer roll ($120,347.51) and the amount reported as expended in Marcal's amended return ($120,143.14). The record in no way supports the former amount.

proceeds in Marcal's net income for its taxable year ended July 31, 1952, is therefore erroneous. It should also be mentioned that there appears to be no dispute as to the applicable law governing any part of the total amount of insurance proceeds which we may hold to be in reimbursement of use and occupancy losses. Both respondent and Marcal recognize that such part of the total insurance proceeds represents a payment in lieu of profits and is taxable at ordinary income tax rates. See *Miller* v. *Hocking Glass Co.*, 80 F. 2d 436, certiorari denied 298 U. S. 659; *Massillon-Cleveland-Akron Sign Co.*, 15 T. C. 79. Both parties also recognize that inasmuch as we are considering a policy of insurance of the nonvalued type, such cases as *Piedmont-Mt. Airy Guano Co.*, 3 B. T. A. 1009, and *Williams Furniture Corporation*, 45 B. T. A. 928, are distinguishable. Finally both parties agree that section 112 (f) (3) of the Internal Revenue Code of 1939 does not apply to any part of the insurance proceeds which is held to be in reimbursement of use and occupancy losses even though such part is reinvested in property similar or related in service to the damaged or destroyed property because the payments for lost earnings are not payments in respect of "converted property." *Miller* v. *Hocking Glass Co.*, *supra;* Regs. 118, sec. 39.112 (f)–1 (c) (8).

1. The question of allocation is peculiarly one of fact. Respondent's notice of deficiency allocates insurance proceeds in the amount of $100,000 to Marcal's use and occupancy insurance contract and proceeds in the amount of $25,000 to Marcal's direct damage insurance contract.

Marcal objects to this allocation or for that matter any allocation which fails to ascribe all of the insurance proceeds to its direct damage insurance contract. It contends that the entire amount of the insurance proceeds is attributable to reimbursement of its direct damage losses and that section 112 (f) (3) of the 1939 Code applies to the recognition of gain to the extent that it expended such proceeds to acquire and install a new dryer roll. While conceding that gain should be recognized to the extent that it failed to expend all of the insurance proceeds which were paid to it, Marcal nevertheless contends that such gain is taxable to it at capital gains rates in accordance with the provisions of section 112 (f) (3) and section 117 (j) (2) of the Internal Revenue Code of 1939. These provisions appear in the margin below.[2]

---

[2] SEC. 112.  RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSION.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and

In support of these contentions Marcal argues that "the insurance company well knew that petitioner had no real claim against it for U and O insurance. There had been no lengthy breakdown with resultant diminution of production. Petitioner knew that it had no legal ground upon which to press for a recovery on the U and O portion of its contract. The damaged machinery had been repaired and was functioning normally. That ended liability." On the other hand it argues that "[i]f the insurance company could get out from under by settling for the cost of the new machine, the risk of U and O payments would be avoided. If the petitioner could collect from

the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of Gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property * * *. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. For the purposes of this paragraph—

(i) no property * * * acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and

(ii) the taxpayer shall be considered to have purchased property * * * only if, but for the provisions of section 113 (a) (9), the unadjusted basis of such property * * * would be its cost within the meaning of section 113 (a).

(B) Period Within Which Property Must Be Replaced.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary, at the close of such later date as the Secretary may designate upon application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary may by regulations prescribe.

SEC. 117. CAPITAL GAINS AND LOSSES.

(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business.—

* * * * * * *

(2) General Rule.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph:

(A) In determining under this paragraph whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsection (d) shall not apply.

(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

the insurance company enough to fully pay for the new machine, it could run the risk of a break-down in the interim."

These arguments are based on Marcal's assumption that its use and occupancy losses and therefore Mutual's use and occupancy liability were limited to those losses of profit which had been sustained at the date the insurance claim was settled. In other words, Marcal assumes that if a claim is settled before it has had time to sustain losses of profit, then, whatever recovery it receives from the insurer is a recovery in respect of direct damage losses.

That such an assumption is faulty is immediately apparent. Mutual's liability under the contract of insurance for use and occupancy losses was "actual loss sustained," not "actual loss sustained at the date the claim is settled." Therefore Mutual's "exposure" to increasing use and occupancy loss continues until the claim is settled and in estimating the amount of such loss it is necessary to consider prospective as well as actual or past losses. This necessitates not only comparisons of actual experience before and after the accident or damage but also estimates of probable experience in the future. Cf. *Fidelity-Phenix Fire Ins. Co.* v. *Benedict Coal Corp.*, 64 F. 2d 347, certiorari denied 289 U. S. 762.

By arguing for the applicability of section 112 (f) (3) of the 1939 Code, Marcal is at least impliedly admitting that it would sustain some losses of profit in the future. Such losses would result from a shutting down of the paper machine to enable its engineers to remove the damaged old dryer roll and replace it with the new dryer roll "similar or related in service." We therefore have no doubt but that some expected losses of profit were taken into consideration when the parties agreed upon a compromise settlement. We think that the agreement with Mutual represents a negotiation for settlement of the insurance dispute and that Marcal gave up a portion of its claim in exchange for a partial reimbursement from Mutual of both its direct damage and its use and occupancy losses.

Marcal recognizes that the "actual cash value" limitation of the policy represents an impediment to its contention that there was no use and occupancy loss or payment. It seeks to eliminate this barrier by arguing that the policy endorsement, in which the $150,000 direct damage per accident limitation was added to the insurance contract, had the effect of revoking the actual cash value limitation. Our interpretation is otherwise. Neither policy limitation refers to or cancels the other. It is clear they are both operative and provide for (1) method of computation, and (2) top limit.

We are satisfied that some allocation of the insurance proceeds is necessary. Certainly Marcal was not bound by the allocation appearing in Mutual's records, an allocation which it did not approve. How-

ever, respondent's determination of $100,000 to use and occupancy and $25,000 to direct damage seems reasonable in view of the cost and age of the old dryer roll, and it was incumbent upon petitioner to present credible evidence of some more reasonable allocation. Petitioner has not done so and for this reason we are compelled to approve respondent's determination in this respect.

2. One further subsidiary issue remains. Respondent has determined that the $25,000 of insurance proceeds which he allocated to the direct damage insurance contract should also be included in Marcal's net income for its taxable year ended July 31, 1953. The reason given by respondent for such inclusion is that Marcal has continued to recover the entire cost of the damaged machinery through annual deductions for depreciation and therefore that its receipt of this $25,000 of insurance proceeds resulted in the realization of gain from the involuntary conversion of property, which gain is recognized pursuant to section 112 (f) (3) of the Internal Revenue Code of 1939, and is considered a gain from the sale or exchange of property used in the trade or business in accordance with section 117 (j) of the Internal Revenue Code of 1939. The crux of respondent's argument is stated by him as follows: "Where a taxpayer recovers through deductions for depreciation the entire cost of a piece of property, he is not entitled to treat insurance proceeds received in reimbursement for damage to that property as non-taxable, for this would allow him, in effect, a double deduction."

Without going into the theory of respondent's argument two practical problems are quickly perceived. First, assuming that there was a gain from the involuntary conversion of the old dryer roll, the evidence indicates, and we have found as facts, that Marcal made a timely election not to recognize gain, that it requested and obtained permission for an extension of time in which it could replace the damaged property with property similar or related in service, that it did in fact replace the damaged property with such property, and that it filed an amended return for its taxable year ended July 31, 1953, all in accordance with the provisions of section 112 (f) (3). Second, we do not think that the evidence supports a finding that "gain" was realized. The evidence shows that Marcal suffered a loss as the result of the damage to its old dryer roll on March 22, 1952. At that time the old dryer roll had a basis of $31,666.67. On August 6, 1952, Marcal agreed with Mutual upon a reimbursement of such damage, which agreement we have now held resulted in an allocated payment of $25,000 in respect of direct damage insurance.

The fact that the damage to the property occurred on March 22, 1952, and the reimbursement was not agreed upon until August 6, 1952, causes an accounting complication but we do not need to con-

sider this problem for it is obvious that the adjusted basis of the property at the time of the "disposition" (settlement) more than equals the amount of reimbursement received even when depreciation during the period March 22–August 6, 1952, is taken into account. Under section 111 (a) gain is defined as "the excess of the amount realized * * * over the adjusted basis." Applying these terms to the above facts our conclusion is that Marcal sustained a loss in the amount of at least $25,000 as the result of the direct damage to the old dryer roll and that this loss was at least partially compensated for by the payment by Mutual of $25,000. The end result was that Marcal received $25,000 in cash and possessed a damaged dryer roll with an adjusted basis reduced by the amount of the loss. No gain was realized because the amount received did not exceed the adjusted basis of the property immediately prior to the involuntary conversion.

Respondent argues further that there is no proof in the record that the $25,000 which he allocated to the direct damage insurance contract actually represents a "casualty" loss in this amount. We cannot agree with respondent in this regard. There is sufficient evidence to support a finding that the old dryer roll was damaged and that the repair measures instituted were not entirely successful even though the old dryer roll's usefulness was extended. Also, there is no requirement that the loss be a "casualty." Any loss affecting business property will reduce the basis of such property.

Before concluding we should state that we agree with respondent that the continued allowance of a depreciation deduction based on the adjusted basis of the old dryer roll immediately prior to the involuntary conversion will, in effect, and at some future date, result in a double deduction. Respondent, however, holds the key to this problem inasmuch as the error is not one of income inclusion but instead that of excessive deduction. If Marcal is in fact asserting an annual deduction for depreciation which is in excess of the amount allowed under section 23 (1) of the Internal Revenue Code of 1939, then respondent's remedy is to disallow any part of the deduction which exceeds allowable depreciation. See secs. 23 (1), 114 (a), and 113 (b). This has not been done in respondent's determination and we are not justified in doing it for him.

For the reasons stated earlier, respondent's determination as to the $100,000 of insurance proceeds allocated to use and occupancy reimbursements is approved and respondent's determination as to the tax consequences of the $25,000 of insurance proceeds allocated to direct damage reimbursements is rejected.

*Decisions will be entered under Rule 50.*