MAX G. NEWBERRY AND TINA F. NEWBERRY, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8322–79.     Filed March 17, 1981.

*Ronnie Joe Lane*, for the petitioners.
*Albert L. Sandlin, Jr.*, for the respondent.

## OPINION

NIMS, *Judge*: Respondent determined a deficiency in petitioners' income tax for the year 1975 in the amount of $810. The issue for decision is whether amounts petitioners received during 1975 as business interruption insurance proceeds constitute "net earnings from self-employment" as defined in section 1402(a).[1]

All of the facts in this case have been stipulated. The stipulation and attached exhibits are incorporated herein by reference.

At the time the petition herein was filed, petitioners resided in Donalsonville, Ga.

During the year 1974, petitioner Max G. Newberry (petitioner) owned and operated a grocery store known as Seminole Grocery, d.b.a. Piggly Wiggly, 209 S/S College (Crawford) Street, Colquitt, Ga. On November 10, 1974, this grocery store was destroyed by fire. From that date until June of 1975, petitioner did not operate the grocery store.

During 1975, petitioner was insured by two insurance policies issued by Southern Guaranty & Insurance Co. Montgomery, Ala., and Southern Trust Insurance Co. Macon, Ga., respectively. Both of these policies contained a loss of earnings endorsement, the purpose of which was to insure petitioner against the interruption of business and loss of earnings caused by any one of the insured perils. From January 1, 1975, through mid-June,

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise specifically indicated.

1975, petitioner received $11,000 from these policies as amounts representing petitioner's lost earnings. The amounts paid by the insurance companies under the policies were based on petitioner's profits (defined as net profit after normal operating expenses).

Petitioners reported the $11,000 as income on their return for 1975 and designated that amount as "Business Interruption Insurance." Petitioners did not report self-employment tax due on this income.

In the notice of deficiency, respondent made the following determination:

(a) It is determined that the $11,000.00 which you received as business interruption insurance proceeds represents net earnings from self-employment. Accordingly, your self-employment tax is $810.00 computed as shown below.

| | |
|---|---:|
| Net earnings from self-employment | $11,000 |
| Largest amount of wages and self-employment earnings subject to social security tax | 14,000 |
| Less: FICA wages | 3,850 |
| Balance | 10,250 |
| Self-employment income—lesser of net earnings from self-employment or balance above | 10,250 |
| Rate | 7.9% |
| Self-employment tax | 810 |

The issue presented in this case is whether the $11,000 which petitioners received in 1975 as business interruption insurance proceeds is subject to self-employment tax.[2] Resolution of this issue depends on the construction to be accorded section 1402(a), which section generally defines net earnings from self-employment as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business."

Respondent notes that there is no dispute that petitioner's grocery business was a trade or business whose profits are subject to the self-employment tax. Such being the case,

---

[2] We note that the "tax on self-employment income" imposed by sec. 1401, unlike the employment taxes imposed on wages in subtitle C, is technically an income tax since sec. 1401 is part of subtitle A of the Code. For convenience, however, we herein refer to the tax on self-employment income as the "self-employment tax."

respondent insists that since the instant proceeds were merely a substitute for the loss of profits from petitioner's grocery business, they are similarly subject to the self-employment tax. Essentially, petitioners argue that since an interruption in business was the sine qua non for their entitlement to the proceeds, they were not "derived from any trade or business *carried on*" and thus are beyond the scope of section 1402(a).

This appears to be a case of first impression on this issue. Respondent has cited various cases concerning the question of whether various types of receipts constitute taxable income for income tax purposes,[3] but for reasons hereafter stated, we do not perceive the immediate relevance of these cases to the self-employment tax. However, we feel that some insight can be drawn from an analysis of the purpose behind the self-employment tax and an examination of the "wage" definition as utilized under the Federal Unemployment Tax Act (FUTA) and the Federal Insurance Contributions Act (FICA). See secs. 3306(b) and 3121(a).

The self-employment tax was enacted by the Social Security Act Amendments of 1950, ch. 809, 64 Stat. 477, in order to assist in the administration of the Social Security system. In particular, it functions to finance the extension of Social Security benefits to self-employed individuals. S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 302, 307–308, 352–353. For individuals who operate their own trades or businesses, it is the counterpart of the taxes imposed on the wages of employees by FUTA and FICA. Its constitutionality was upheld in *Cain v. United States*, 211 F.2d 375 (5th Cir. 1954), cert. denied 347 U.S. 1013 (1954), and also in numerous cases in this Court.[4]

In the employee context, liability for FUTA and FICA taxes is imposed only on the basis of wages received by employees. Secs. 3101(a), 3301. Non-wage income is simply not subject to either tax. The term wages, in general, is defined to include all remuneration for "employment." Secs. 3121(a), 3306(b). Employ-

---

[3]For example, *Miller v. Hocking Glass Co.*, 80 F.2d 436 (6th Cir. 1935), cert. denied 298 U.S. 659 (1936); *Marcalus Manufacturing Co. v. Commissioner*, 30 T.C. 1345 (1958), affd. per curiam 268 F.2d 739 (3d Cir. 1959), cert. denied 361 U.S. 924 (1959); *Massillon-Cleveland-Akron Sign Co. v. Commissioner*, 15 T.C. 79 (1950).

[4]E.g., *Syring v. Commissioner*, T.C. Memo. 1978–419; *Krom v. Commissioner*, T.C. Memo. 1978–280; *Joel v. Commissioner*, T.C. Memo. 1976–319.

ment generally means any service an employee performs for the person employing him. Secs. 3121(b), 3306(c).

Section 1402(a) defines self-employment earnings as the "gross income derived by an individual from any trade or business *carried on* by such individual." (Emphasis supplied.) Respondent's position requires a reading of "carried on" to mean carried on at *some point*: past, present, or future. In other words, there is no requirement that the income in question result from the operation of the taxpayer's trade or business. Thus, the individual's *previous* business activity would suffice to satisfy the "carried on" requirement of the statute.

We agree, however, with petitioner's position that there must be a nexus between the income received and a trade or business that is, or was, actually carried on. Put another way, the construction of the statute can be gleaned by reading the relevant language all in one breath: the income must be derived from a trade or business carried on. That there be some trade or business activity by the taxpayer which gives rise to the income is evidenced by the Senate report which accompanied the first enactment of the self-employment tax:

The trade or business must be "carried on" by the individual, either personally or through agents or employees, in order for the income to be included in his "net earnings from self-employment." Accordingly, gross income derived by an individual from a trade or business carried on by him does not include income derived by a beneficiary from an estate or trust even though such income is derived from a trade or business carried on by the estate or trust. [S. Rept. 1669, *supra*, 1950–2 C.B. at 354.]

We note that this statutory construction is in keeping with respondent's interpretation of the wage definition under FICA and FUTA. In Rev. Rul. 56–110, 1956–1 C.B. 488, an employer established a plan to provide workers with unemployment benefits in addition to any State unemployment benefits they might receive, a context analogous to the instant case. In that ruling, the Commissioner held that benefits from such a plan, although income under section 61(a), are not wages for purposes of FUTA, FICA, or income tax withholding. The same result obtained in Rev. Rul. 60–330, 1960–2 C.B. 46.

Even though no rationale was contained in Rev. Rul. 56–110, *supra*, as to why such benefits did not constitute wages, the result appears to be compelled by virtue of the statutory definition. Because the unemployed worker performs no services

there is no employment. Since the benefits are not remuneration for employment, they consequently cannot be considered wages. This construction of the statute is borne out by respondent's rulings which deal with strike and lockout benefits paid by unions to their members.

In Rev. Rul. 58–139, 1958–1 C.B. 14, and Rev. Rul. 68–424, 1968–2 C.B. 419, the Commissioner ruled that strike benefits includable in gross income are not wages for FICA and FUTA purposes. The latter ruling specifically states that the nonperformance of services provides the justification; strike benefits are paid solely because of an employee's union affiliation and not as remuneration for any services performed.[5]

We concur with the legal analysis set forth in the abovementioned revenue rulings. Although we are mindful that such rulings represent only the Commissioner's legal position as to a particular set of hypothesized facts and are not binding on this Court (*BHA Enterprises, Inc. v. Commissioner*, 74 T.C. 593, 602 (1980); *Lemery v. Commissioner*, 54 T.C. 480, 489 (1970)), the problem presented herein is sufficiently analogous to warrant an examination of the rationale and result contained in the cited rulings. See *Groves v. United States*, 533 F.2d 1376 (5th Cir. 1976), affg. an unreported District Court decision (N.D. Fla. 1974, 35 AFTR 2d 75–817, 75–1 USTC par. 9212), cert. denied 429 U.S. 1000 (1976).

In Rev. Rul. 56–110, *supra*, the employee's failure to engage in his trade or business activity (i.e., providing services as an employee, see *Primuth v. Commissioner*, 54 T.C. 374 (1970)) was a prerequisite for the receipt of supplemental unemployment benefits. Although eligibility for these benefits may be the result of the individual's employee status at some previous time, in no way are the benefits a function of the employee's providing services for his employer. Those benefits are not derived from any employment carried on.[6]

---

[5]Compare the situation presented in Rev. Rul. 75–475, 1975–2 C.B. 406, where certain strike benefits, paid only to those union members who performed various strike-related activities, were held to be wages.

[6]We note that in Rev. Rul. 73–22, 1973–1 C.B. 410, the Commissioner ruled that payments to union member employees under a guaranteed annual wage plan negotiated and administered by an employer association are wages under FICA, FUTA, and the income tax withholding provisions of the Code. As recited in the ruling, the plan "guaranteed a minimum number of

In the same vein, petitioner's inability to operate the grocery store following its destruction gave rise to the proceeds at issue. Indeed, petitioner's insurance policy is the self-employed individual's counterpart to the supplemental unemployment benefit plan contained in Rev. Rul. 56–110, *supra*. Both plans are essentially private benefit mechanisms intended to compensate an individual while he is not able to engage in his income-producing activity. The comparable statutory terms—*carrying on* a trade or business and *rendering* services—suggest to us that any income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to either FUTA, FICA, or self-employment taxes, as the case may be. This harmonious result is particularly warranted in view of the integration of the definition of self-employment income with the wages definition for purposes of computing an individual's self-employment tax liability. See sec. 1402(b); sec. 1.1402(b)–1(b), Income Tax Regs.

The cases which respondent has cited, *Miller v. Hocking Glass Co.*, 80 F.2d 436 (6th Cir. 1935), cert. denied 298 U.S. 659 (1936); *Marcalus Manufacturing Co. v. Commissioner*, 30 T.C. 1345 (1958), affd. per curiam 268 F.2d 739 (3d Cir. 1959), cert. denied 361 U.S. 924 (1959); *Massillon-Cleveland-Akron Sign Co. v. Commissioner*, 15 T.C. 79 (1950); *International Boiler Works Co. v. Commissioner*, 3 B.T.A. 283 (1926); *Oppenheim's, Inc. v. Kavanagh*, 90 F. Supp. 107 (E.D. Mich. 1950), are not helpful. All of them concern the issue of whether proceeds received under a use and occupancy policy as compensation for lost profits are realized or recognized income[7] for income, not employment, tax purposes. As we have indicated, wholly different concepts govern the question of taxability of insurance or similar proceeds under the two respective taxes. In *Central Illinois Public Service Co. v. United States*, 435 U.S. 21 (1978), the Supreme Court observed that "Decided cases have made the distinction between wages and income and have refused to equate the two in withholding or *similar* controversies." (Em-

---

hours of employment per contract year multiplied by the then-current straight-time hourly rate." Consequently, the ruling is not apposite since, as the Commissioner himself ruled, the plan "is not a supplemental *unemployment* compensation plan." (Emphasis supplied.)

[7]Respondent has also cited *Maryland Shipbuilding & Drydock Co. v. United States*, 187 Ct. Cl. 523, 409 F.2d 1363 (1969), a case involving the same issue of income recognition, but in a different factual context.

phasis supplied.) We conclude that it would be appropriate to make such a distinction between net earnings for self-employment tax purposes and income under section 61(a).

We are also not persuaded by respondent's reliance upon Rev. Rul. 76–500, 1976–2 C.B. 254. In that ruling, a farmer suffered an uninsured crop loss in the amount of $8,000. Subsequently, the farmer was granted an $8,000 emergency loan by the Farmers Home Administration. At the time the loan was granted, $5,000 of principal was canceled pursuant to the provisions of Pub. L. 92–385, 86 Stat. 554, the purpose of the cancellation being to reimburse the farmer for his uncompensated loss. Respondent ruled that since the effect of the cancellation was to provide the farmer with compensation for his loss of future profits or potential income, it must be taken into account in computing net earnings from self-employment.

Aside from the nonprecedential nature of the ruling insofar as this Court is concerned, we perceive more of a casual nexus in Rev. Rul. 76–500, *supra,* between the operation of a trade or business and the cancellation income. The taxpayer therein had to engage in some farming activity in order to plant and grow the damaged crops. As a result, the loan cancellation can be considered, at least in part, to be derived from the taxpayer's farming operations. By contrast herein, there is a complete dearth of business activity. In any event, we pass no judgment here as to the correctness of the Commissioner's position in Rev. Rul. 76–500.

Accordingly, we hold that the business interruption proceeds which petitioners received are not earnings from self-employment, and petitioners are not, therefore, liable for self-employment taxes for the year 1975.

*Decision will be entered for the petitioners.*