T.C. Memo. 2002-29

UNITED STATES TAX COURT

ORIN F. FARNSWORTH AND MARY L. FARNSWORTH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14460-99.                    Filed January 28, 2002.

Orin F. Farnsworth and Mary L. Farnsworth, pro sese.

<u>Paul K. Webb</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined a deficiency of
$111,808 in petitioners' joint Federal income tax for 1995.

After concessions by the parties, there are two issues for
decision:  (1) Whether petitioners are entitled to exclude from
income, as a recovery of basis, any portion of the "contract
value" termination payments received in 1995 by petitioner Orin

F. Farnsworth under his District Manager's Appointment Agreement (DMAA) with Farmers Insurance Group, and (2) whether petitioners are liable for self-employment tax under section 1401[1] on the DMAA "contract value" termination payments.

We hold that petitioners are not entitled to exclude from income any portion of the DMAA "contract value" termination payments because petitioners failed to prove that Mr. Farnsworth had any basis in the DMAA contract.  We further hold that the DMAA "contract value" termination payments included in petitioners' income are subject to self-employment tax under section 1401.

FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated by this reference.

Petitioners were residents of Redding, California, when they filed their petition.  Petitioners are married and filed a joint Federal income tax return, Form 1040, U.S. Individual Income Tax Return for the taxable year 1995.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

On April 18, 1954, petitioner Orin F. Farnsworth (Mr. Farnsworth), formerly known as Jose Farnsworth, married Gloria Farnsworth, from whom he is now divorced.

From 1956 through part of 1962, Mr. Farnsworth was employed as an agent of Farmers Insurance Group[2] (Farmers) in El Paso, Texas, selling home, commercial casualty and life insurance.

In 1962, Mr. Farnsworth, Gloria Farnsworth, and their family moved to Chico, California. From 1962 through part of 1966, Mr. Farnsworth worked as a division agency manager for Farmers in the Chico, California, area.

On September 30, 1966, Mr. Farnsworth applied to become a district manager with Farmers. On November 1, 1966, Farmers and Mr. Farnsworth entered into the DMAA, under which he was appointed district manager for district number 98-26, in Redding, California. The DMAA between Mr. Farnsworth and Farmers was effective, including addenda, from its execution on November 1, 1966 through Mr. Farnsworth's retirement on January 31, 1995.

Under the DMAA, Farmers agreed to pay Mr. Farnsworth an "overwrite" on all business produced by agents of Farmers within district number 98-26. An "overwrite" is a percentage of the commissions earned by the sales agents supervised by the district

---

[2]Farmers Insurance Group (Farmers) is a collection of companies which, during 1966, included Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Co., and Farmers New World Life Insurance Co.

manager.  Under the DMAA, Farmers also provided certain benefits to Mr. Farnsworth, including life and health insurance, in accordance with Farmers's rules.  Mr. Farnsworth, in return, agreed to recruit and train as many agents acceptable to Farmers as might be required to produce sales in accordance with the goals and objectives established by Farmers; to actively represent only Farmers; to conform to Farmers's regulations and operating principles; to maintain in full force and effect any required licenses; to provide service to policyholders through the agents; to maintain and make available for audit by Farmers adequate records, including profit and loss statements; and to surrender on cancellation or termination of the DMAA agreement all records, levy lists, cards, books, manuals, papers, forms, or other material of whatsoever kind, and all copies thereof, having to do with the business of Farmers.  Farmers had the exclusive right to decrease or otherwise change overwrite rates, schedules or classifications.

The DMAA was terminable by either Farmers or Mr. Farnsworth without cause on 30 days' notice.  The DMAA was also terminable immediately by Farmers for cause on specified grounds.

The DMAA provided that upon cancellation by either party without cause or as a result of Mr. Farnsworth's death, Farmers would have the right to pay Mr. Farnsworth the "contract value" and terminate the contract.  If Farmers did not exercise its

right to pay "contract value", Mr. Farnsworth or his estate could attempt to sell his district manager position to a successor nominee acceptable to Farmers for an amount not exceeding "contract value".

The amount of the "contract value" referred to in the DMAA was based upon a schedule that took into account (1) the service commission overwrite paid to the district manager during the 6 months immediately preceding termination, and (2) the number of years of service completed by the district manager. In the case of Mr. Farnsworth, who had worked for more than 20 years as a district manager at the time of termination, the DMAA provided for a "contract value" of seven times the last 6 months' service commission overwrite.

The DMAA specified that all lists and records of any kind pertaining to policyholders or expirations, and also the information contained therein, were the secret and confidential property of Farmers and were never to be used or divulged by Mr. Farnsworth. All policy rights remained the property of Farmers. Mr. Farnsworth had no rights or privileges in the continuing effectiveness of the policies produced for Farmers. Mr. Farnsworth had no interest, assignable or otherwise, in the district or in the DMAA, except as to the "contract value" payments upon termination without cause.

On November 1, 1966, Mr. Farnsworth and Farmers signed an addendum to the DMAA, amending his concurrently signed DMAA. The November 1, 1966, addendum to the DMAA reduced Mr. Farnsworth's overwrite commissions to the portion of the overwrite in excess of $935 per month. The monthly reduction in the overwrite payable to Mr. Farnsworth is commonly referred to as the "retention amount". Under the terms of the addendum, the retention amount was to be withheld for the first 120 months of the contract (10 years). Commencing with the 121st month, the retention would be reduced or eliminated if Farmers, in its discretion, determined that Mr. Farnsworth's performance warranted the reduction.

A second addendum to the DMAA, entered into by Farmers and Mr. Farnsworth on February 6, 1968, reduced the "retention amount" from $935 per month to $605 per month, but extended the term of the retentions to the 178th month of the contract (approximately 15 years from inception of the contract). Commencing with the 178th month, the retention would be reduced or eliminated if Farmers, in its discretion, determined that Mr. Farnsworth's performance warranted the reduction.[3]

---

[3]The stipulation of facts between petitioner and respondent mischaracterized the retention amounts as commencing, rather than terminating or being reduced, on the 121st and 178th month of the DMAA, respectively. The addenda make clear, however, that the retention amounts were to be withheld commencing immediately, and were to continue until the 121st and 178th month, respectively,
(continued...)

In order to reimburse itself for the cost of paying "contract value" to retiring district managers (rather than requiring the retiring managers to sell their interests to the replacement managers), Farmers began in 1965 to impose retention amounts on its new district managers. The retention amounts withheld by Farmers from the compensation it paid to a new district manager were not used to fund deferred compensation to the new district manager upon retirement. Instead Farmers used the retention amounts to reimburse itself for the cost of paying "contract value" retirement benefits to the retiring manager. Farmers conditioned the new district manager's right to receive "contract value" benefits from Farmers at retirement on his agreement to have retention amounts withheld.

In issuing a Form 1099 reporting income to a district manager, Farmers would take the commission overwrite earned by the district manager and then deduct any "retention amount" withheld from the district manager's earnings to arrive at the gross income of the district manager. During the entire time

---

[3](...continued)
and we so find. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The total payments under both addenda would have been approximately equal. The first addendum called for retentions of $935 per month for 120 months, totaling approximately $112,200. Assuming the retentions called for under the first addendum were withheld until the effective date of the second addendum, there would have been retentions of $935 per month for 17 months, followed by retentions of $605 per month for the remaining 160 months, totaling $112,695.

that Mr. Farnsworth worked as a district manager, Farmers maintained standard accounting practices nationwide, under which it did not report any "retention amounts" as income to its district managers.

During that same time, Mr. Farnsworth did not treat the retention amounts as income and did not pay income taxes on the retention amounts.

Mr. Farnsworth and Gloria Farnsworth were divorced on November 8, 1988, pursuant to a marital settlement agreement filed in the California Superior Court. Gloria Farnsworth is not a party to this proceeding. Under the terms of the marital settlement agreement, Mr. Farnsworth assigned to Gloria Farnsworth 32.91 percent of his right to contract value under the DMAA.

In July 1989, the Farmers Insurance Group Federal Credit Union approved a loan to Mr. Farnsworth of $25,001 secured by an assignment of Mr. Farnsworth's "contract value" in the DMAA. In May 1991, Mr. Farnsworth agreed to guarantee a loan by Farmers to Fred Fourby, an agent of the company, secured by Mr. Farnsworth's right to "contract value" upon termination of the DMAA. Mr. Farnsworth retired from Farmers on January 31, 1995. At Mr. Farnsworth's retirement, his "contract value" under the DMAA was $761,740. Farmers deducted from the full "contract value" of $761,740 (1) the outstanding Credit Union loan balance of

$20,513.68, and (2) the remaining balance of $5,196.53 on the Fredy Fourby loan guaranty, resulting in a net "contract value" of $736,029.79.

Pursuant to the DMAA and the divorce decree, Farmers made the following "contract value" payments during taxable years 1995 and 1996:

|  | Orin Farnsworth | Gloria Farnsworth | Total |
|---|---|---|---|
| Mar. 2, 1995 | $161,780.38 | $83,562.88 | $245,343.26 |
| July 31, 1995 | 161,780.38 | 83,562.88 | 245,343.26 |
| Jan. 31, 1996 | 161,780.39 | 83,562.88 | 245,343.27 |
| Total | 485,341.15 | 250,688.64 | 736,029.79 |

Petitioners reported a taxable gain of $263,156 on Form 4797, Sales of Business Property, and Form 6252, Installment Sale Income, attached to their Form 1040 for taxable year 1995. Petitioners reported the total gross "contract value", amounting to $761,740, which amount included:  (1) All payments made to Mr. Farnsworth in taxable years 1995 and 1996; (2) all payments made to Orin Farnsworth's former wife, Gloria Farnsworth; (3) the canceled credit union loan valued at $20,513.68, which was offset by Farmers; and (4) the Fred Fourby loan guaranty of $5,196.53, which was also offset by Farmers.

Petitioners reduced the gross "contract value" of $761,740 by $373,560 for "cost or other basis of property sold".  The "cost or other basis" claimed by petitioners consisted of the

entire $250,689 (rounded) which Farmers paid from the "contract value" directly to Gloria Farnsworth during 1995 and 1996, and an additional $122,871 in alleged basis, leaving a reported gross profit of $388,180.

Petitioners reported on Form 6252 receiving $516,397 in "contract value" payments in 1995, consisting of:  (1) $323,560 of "contract value" received by Mr. Farnsworth; (2) $167,126 of "contract value" received by Gloria Farnsworth; (3) the canceled credit union loan of $20,514 (which was apparently repaid by Farmers out of the contract value); and (4) the $5,197 Fred Fourby loan guaranty (which was apparently also repaid or withheld by Farmers).

Using Mr. Farnsworth's and Gloria Farnsworth's relative shares of total contract receipts, petitioners reported a gross profit percentage of 50.96 on Form 6252.  For 1995, on the basis of total payments reportedly received by Mr. Farnsworth and Gloria Farnsworth of $516,397, petitioners reported taxable installment sale income for the year of $263,156 (50.96 percent x $516,397 = $263,156).

Respondent's notice of deficiency disallowed the reduction from "contract value" for the payments made by Farmers directly to Gloria Farnsworth, disallowed the reduction of Mr. Farnsworth's claimed recovery of basis in the DMAA, and

determined that the "contract value" payments are subject to self-employment tax under section 1401.

Respondent's answer concedes that the $167,126 in "contract value" paid by Farmers directly to Gloria Farnsworth during 1995 should be taxable to Gloria Farnsworth and not to petitioners.

OPINION

Issue 1. Are Petitioners Entitled To Exclude From Income, As a Recovery of Basis, Any Portion of the DMAA Payments They Received in 1995?

Petitioners have the burden of proof to establish the amount of Mr. Farnsworth's basis, if any, in the DMAA contract. See Rule 142 (burden of proof generally on petitioner); Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 220 (1998) (Court accepted Commissioner's determination that taxpayer had no basis in stock where taxpayer failed to introduce evidence to establish basis in stock); Reinberg v. Commissioner, 90 T.C. 116, 142 (1988) (petitioners not entitled to depreciation deductions because they failed to meet burden of proof by establishing basis).

Petitioners argue that Mr. Farnsworth has basis in the DMAA contract because he treated the retention amounts as income on his Federal income tax returns. Petitioners failed to introduce any documentary evidence to support their contention. Petitioners do not have copies of Mr. Farnsworth's Federal income tax returns from the relevant years to show that he reported as

taxable income any of the "retention amounts" withheld by Farmers.

Mr. Farnsworth's testimony regarding the retention amounts was vague and inconsistent with the provisions of the DMAA and the addenda.  Mr. Farnsworth claims to have a basis in the DMAA of $86,000.  He testified that Farmers withheld retention amounts for 6 years.  Yet the documentary evidence shows originally required retentions of $935, which were thereafter reduced to $605 per month.  Retentions of $935 per month for 6 years would total only $67,320, substantially less than the $86,000 basis petitioners claimed.  The reduced retention of $605 per month beginning in March 1968 for the remainder of the 6-year period would have resulted in total retentions of only $49,170.[4]  Mr. Farnsworth was unable to explain the discrepancies between his recollection of the facts, the basis he claimed, and the terms of the addenda.  Mr. Farnsworth admitted that he had no documentation to show the amount that Farmers actually retained. The only evidence offered to support Mr. Farnsworth's claim that he has basis in the DMAA was his self-serving testimony, testimony that was based on his recollection of events 25 to 30 years before the trial.

---

[4]Payments of $935 per month for 17 months from November 1966 to March 1968, plus the remaining 55 months of payments at $605 per month, for a total of 72 months of payments (6 years).

Mr. Farnsworth also claimed that the retention amounts included interest (at a rate he does not recall), which he deducted.  Presumably, Mr. Farnsworth's basis would be less than the $67,320 or $49,170 if some portion of the monthly retention amounts included interest that he deducted.  Mr. Farnsworth's testimony showed that he did not clearly recollect the facts, and that the amount claimed as "basis" was, at best, a very rough estimate.

Petitioners offered no reliable evidence upon which the Court could determine the actual retention amounts withheld by Farmers.  Mr. Farnsworth has asserted that the terms of the addenda were not followed, but he has failed to provide any credible evidence of the amounts actually retained by Farmers.  Petitioners have thus failed to meet their burden of establishing the retention amounts with credible evidence.

While we should not disallow entirely all amounts because only some amounts have been proven, see Cohan v. Commissioner, 39 F.2d 540, 543 (2d Cir. 1930), "the basic requirement is that there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose.  Until the trier has that assurance from the record, relief to the taxpayer would be unguided largesse." See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957).

In the case at hand, petitioners have failed to convince us of a specific amount that was withheld as retentions. We know that the contractual terms were not followed, that no reliable documentary evidence is available to establish the true retention amounts, and that Mr. Farnsworth's testimony concerning the retention amounts satisfies neither the rules of arithmetic nor the laws of probability.

More importantly, even if petitioners had established the retention amounts, petitioners have failed to establish by a preponderance of the evidence that the retention amounts were included in Mr. Farnsworth's taxable income. In order for the retention amounts to give Mr. Farnsworth a basis in the DMAA, petitioners would have to establish that Mr. Farnsworth reported the retention amounts as income for the years in which they were withheld; otherwise the retention amounts would not constitute a cost of his interest in the DMAA that would be taken into account for income tax purposes. See sec. 1012 (basis of property is cost); Gertz v. Commissioner, 64 T.C. 598 (1975) (disallowing bad debt deduction for unpaid wages that were never included in income).

Petitioners offered no evidence, other than Mr. Farnsworth's self-serving testimony, to show that Mr. Farnsworth previously included the retention amounts in income.

Respondent called Carl Earl Diltz, Jr., to explain Farmers's policy regarding the tax treatment of retention amounts. Mr. Diltz was employed by Farmers in its accounting department for 36 years and is now retired. Mr. Diltz began his career at Farmers as an accounting clerk in 1959 and ended his career in 1995 as director of accounting for the entire company. Mr. Diltz was thoroughly familiar with Farmers's DMAA contracts, including the terms, dates that the terms were changed, and the reasons why the terms were changed. Mr. Diltz's testimony was highly credible.

Mr. Diltz testified that Farmers always reduced the amount of income to the district managers reported on the Forms 1099 by the retention amounts, and that Farmers did not treat the retention amounts as taxable income to the managers under the DMAAs:

> Q. [D]uring your tenure from * * * 1959 to 1995 when you retired, was it ever Farmers procedure to report those retention amounts as income to district managers?
>
> A. No.

Mr. Diltz also testified that Farmers's procedures were consistently followed on a nationwide basis, and that it was his "primary responsibility as a director to develop those procedures and to see that all 16 offices were doing exactly the same thing". We therefore have found that Farmers did not report the retention amounts as income to Mr. Farnsworth.

We sustain respondent's determination denying petitioners any reduction in income attributable to Mr. Farnsworth's claimed basis in the DMAA. Petitioners have established neither the amount of the retentions nor that any such retentions would bestow on Mr. Farnsworth a basis in the DMAA.

Issue 2. Are the DMAA Payments Subject to Self-Employment Tax?

The self-employment tax was enacted in 1950 to finance the extension of Social Security benefits to self-employed individuals. Social Security Act Amendments of 1950, ch. 809, 64 Stat. 477; S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 302, 307-308, 352-353.

Section 1402(a) defines self-employment earnings as "gross income derived by an individual from any trade or business carried on by such individual".

The seminal case considering the meaning of the "carried on" requirement is Newberry v. Commissioner, 76 T.C. 441 (1981), in which this Court held that business interruption insurance proceeds paid to the owner of a grocery store destroyed by fire were not subject to self-employment tax. The Commissioner argued in Newberry that business interruption insurance proceeds were a substitute for the business income that would have been earned but for the fire that destroyed the grocery store. The income that would have been earned but for the fire would have been

subject to self-employment tax.  Therefore, the Commissioner argued, so should the insurance proceeds.

This Court rejected the Commissioner's argument, holding "that there must be a nexus between the income received and a trade or business that is, or was, actually carried on".  Id. at 444.  Since the insurance proceeds were received not from the operation of the business, but rather because of the nonoperation of the business, we held that the proceeds were not subject to self-employment tax.

> The comparable statutory terms--carrying on a trade or business and rendering services--suggests to us that any income must arise from some actual (whether present, past or future) income-producing activity of the taxpayer before such income becomes subject to either FUTA, FICA, or self-employment taxes, as the case may be.  * * *  [Id. at 446.]

From this small seed has grown a great tree of self-employment tax jurisprudence, a tree with many branches.  One large branch of the tree is made up of cases concerning insurance company agent and manager termination payments.

One of the principal cases addressing whether insurance company agent termination payments are subject to self-employment tax is Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655, in which the Court of Appeals for the Ninth Circuit, to which the case at hand would be appealable, reversed a decision of this Court.  The taxpayer in Milligan, a former State Farm insurance agent, received termination payments

upon retirement.  Under the State Farm agreement, the taxpayer was entitled to 5 years of termination payments based on a fixed percentage of his final year's commissions.  The taxpayer was eligible for termination payments only if the termination occurred more than 2 years after the contract was entered into.

The termination payments were also subject to reduction for refundable commissions that had already been earned by the taxpayer on policies that were canceled during the year following termination.  The reductions were called "chargebacks".

This Court held, in a Memorandum Opinion, that the termination payments were subject to self-employment tax because the payments were "derived", in the dictionary meaning of the word, from petitioner's prior employment.  The termination payments were found to be analogous to the payment of future commissions on policies written during the term of the contract, which had been held subject to self-employment tax in Becker v. Tomlinson, 9 AFTR 2d 1408, 62-1 USTC par. 9446 (S.D. Fla. 1962):

> We find that Termination Payments are the equivalent of the deferred compensation which a State Farm agent, active or retired, would receive from policies sold in prior years.  On this basis, we hold that Termination Payments are derived from self-employment, even though they are received in years subsequent to the activity which generated them. [Milligan v. Commissioner, T.C. Memo. 1992-655.]

In reversing the Tax Court's decision in Milligan, the Court of Appeals for the Ninth Circuit held that "to be taxable as self-employment income, earnings must be tied to the quantity or

quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor."  Milligan v. Commissioner, 38 F.3d at 1098.

The Court of Appeals found that the taxpayer's earnings were not tied to the quantity of his prior labor.  The Court of Appeals ruled that the 2-year qualification requirement related only to the taxpayer's eligibility for termination payments; the payment amounts did not depend on the taxpayer's length of service beyond the period of eligibility.  The Court of Appeals pointed out that it did not matter whether the taxpayer had worked for State Farm for 2 years or 20--the payments would in either case be the same.  Because the payment amounts did not depend on the length of service or overall earnings, the payments were not tied to the quantity of the taxpayer's services.

In the same vein, the Court of Appeals held that the termination payments did not depend on the quality of the taxpayer's prior service.  The Court of Appeals recognized that the payments were based on the taxpayer's final year's commissions.  According to the Court of Appeals, "At most, the amount of the Termination Payments, not the payments themselves, actually arose from Milligan's business activity."  Id. at 1099. The Court of Appeals went on to note that even the amount was not entirely related to Milligan's prior earnings, because of the potential for chargebacks based on future policy cancellations

over which Milligan had no control.  Because these chargebacks
were entirely unrelated to Milligan's business activity, the
Court of Appeals held that the payments were not tied to the
quality of the taxpayer's prior services.  The Court of Appeals
in Milligan therefore concluded that the termination payments did
not derive from the "carrying on" of the taxpayer's trade or
business and so were not subject to self-employment tax.

In Gump v. United States, 86 F.3d 1126 (Fed. Cir. 1996), the
Court of Appeals for the Federal Circuit followed Milligan in a
virtually identical factual situation involving the "extended
earnings" of a Nationwide Insurance Co. agent.  As in Milligan,
the taxpayer in Gump was entitled to receive upon termination of
his agency contract a percentage of his final year's earnings if
he had performed services under the contract for more than 5
years.  The earnings were subject to reduction for policy
cancellations occurring in the 2 years after termination.
Following Milligan, the Court of Appeals for the Federal Circuit
held that the payments were not based on the "quantity or
quality" of the taxpayer's prior services and therefore were not
subject to self-employment tax.  The Court of Appeals for the
Federal Circuit explained in Gump the reason for the rule as
follows:

> Thus, the extended earnings are not unpaid renewal
> commissions, they are computed by reference to renewal
> commissions--a reasonable indicator of the value of
> Gump's insurance business at the time he relinquished

control of it.  The amount is unaffected by his income during any prior period, by the total number of policies written over his career, by the total time period he served as an agent, or even by the length of his service to Nationwide.  In other words, the amount is not "tied to the quantity or quality" of his labor in any meaningful way.  [Id. at 1130.]

An offshoot of the tree sprouted in Schelble v. Commissioner, 130 F.3d 1388 (10th Cir. 1997), affg. T.C. Memo. 1996-269.  There, the "extended earnings" of an American Family Life Insurance Co. independent agent were held to be subject to self-employment tax.  Both the Tax Court and the Court of Appeals for the Tenth Circuit distinguished Milligan on its facts, on the ground that the payments to the taxpayer in Schelble depended on the quantity and quality of his prior self-employment services.

In general, the extended earnings payments were calculated based on a percentage of the renewal service fees paid to the agent during the six- or twelve-month period preceding the month the Agreement terminated. The percentage was based upon the agent's length of consecutive service for the Companies immediately preceding termination of the Agreement. * * *  [Id. at 1390.]

Unlike Milligan, the amount of termination payments to be received by the taxpayer in Schelble depended on the length of his service to the insurance company and were tied entirely to his earnings during the 12-month period prior to termination without being subject to any posttermination adjustments for events outside of his control (such as, in Milligan, chargebacks for policy cancellations after termination of the agreement). The Court of Appeals in Schelble distinguished Milligan and held

that "Mr. Schelble's payments are tied to the quantity and quality of his prior services performed for the Companies." Id. at 1393.

The Court of Appeals in Schelble also distinguished Gump v. Commissioner, supra. Id. The "extended earnings" payments in Gump were calculated in the same way as the termination payments in Milligan and differently from the "extended earnings" in Schelble. The Court of Appeals for the Tenth Circuit rejected the taxpayer's suggestion that the label attached to the payments has any tax significance.

> However, the payment scheme in Gump is nearly identical to that in Milligan and distinguishable from Mr. Schelble's payment scheme. For the same reasons we reject Milligan, we also find Gump does not apply [to] Mr. Schelble's case. [Schelble v. Commissioner, supra at 1393-1394.]

In Jackson v. Commissioner, 108 T.C. 130 (1997), the Tax Court, in a reviewed opinion, followed Milligan in a case that would not have been appealable to the Court of Appeals for the Ninth Circuit. Like Milligan, Jackson involved termination payments to a State Farm agent under a contract providing for a 2-year qualification period, payments based on a fixed percentage of the final-year's compensation without regard to the length of service, and a reduction for commission chargebacks on policies canceled after termination. Following Milligan, this Court held that the termination payments were not subject to self-employment

tax because the payments were not tied to the "quantity or quality" of the employee's services.

This Court in Jackson also recognized the factual distinction identified in Schelble: where the termination payments are tied to the quantity or quality of the taxpayer's prior services, the payments will be subject to self-employment tax. Jackson v. Commissioner, supra at 136.

In Lencke v. Commissioner, T.C. Memo. 1997-284, after distinguishing the facts from those in Milligan and Jackson, this Court held that payments in lieu of renewal commissions to which an insurance agent would otherwise be contractually entitled are subject to self-employment tax because the payments retain the character of the renewal commissions they replaced.

Congress, in section 1402(k), codified the standard established in Milligan with respect to termination payments made after December 31, 1997, to an "insurance salesman". Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 922(a), 111 Stat. 879-880. Section 1402(k) exempts insurance salesman termination payments from self-employment tax if, among other things, the amount of the payments "does not depend to any extent on length of service or overall earnings from services performed for such company (without regard to whether eligibility for payment depends on length of service)." Sec. 1402(k)(4)(B). The parties agree that section 1402(k) does not apply to the case at hand,

because Mr. Farnsworth was not an "insurance salesman", and because the payments were made in 1995, before the effective date of the statute.  However, the legislative history of section 1402(k) makes it clear that the provision was intended to codify existing law.[5]

Factually, the case at hand is like Schelble, and unlike Jackson, Gump, and Milligan, because the amount of Mr. Farnsworth's termination payments depended on the length of his relationship with Farmers.  Mr. Farnsworth's "contract value" referred to in the DMAA was based upon a schedule that took into account the number of years of service completed by the district manager.  This was more than a one-step eligibility requirement. The longer the taxpayer's tenure as district manager, the higher the percentage of the taxpayer's final 6 months' earnings that was used to compute "contract value".  The amount varied between three times the last 6 months' service commission overwrite for a district manager with 5 years of service to seven times the last 6 months' service commission overwrite for a manager who had, as

---

[5]After citing Jackson v. Commissioner, 108 T.C. 130 (1997), Gump v. United States, 86 F.3d 1126 (Fed. Cir. 1996), and Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655, the Conference Committee report states: "The House bill codifies case law by providing that net earnings from self-employment do not include any amount received during the taxable year from an insurance company on account of services performed by such individual as an insurance salesman for such company".  H. Conf. Rept. 105-220 at 458 (1997), 1997-4 C.B. (Vol. 2) 1457, 1927-1929.

Mr. Farnsworth did, 20 or more years of service as a district manager.

Moreover, unlike the taxpayers in <u>Jackson</u>, <u>Gump</u>, and <u>Milligan</u>, the payments to which Mr. Farnsworth was entitled were not subject to reduction for events unrelated to his services and occurring after termination.

There is also evidence in the record to suggest a significant relationship between Mr. Farnsworth's rights under the DMAA to recover "contract value" at termination and his agreement at inception of the DMAA to have the retention amounts withheld. Mr. Diltz testified that the retention amounts were imposed in order to enable Farmers to recover from a successor manager the cost of paying "contract value" to the retiring manager replaced by the successor. Prior to the requirement for the successor manager to have retention amounts withheld, there was no provision for the payment of contract value upon termination. While there is no relationship between the new manager's retention <u>amount</u> and the "contract value" <u>amount</u> (because the retention amount is based on the former manager's contract value), the successor manager's <u>right</u> to contract value upon his retirement was conditioned upon his agreement to have the retention amounts withheld. There was thus a causal relationship between the right to contract value and the retention requirement. The causal relationship between Mr.

Farnsworth's agreement to allow his overwrite commissions to be reduced by retentions and his right to recover "contract value" upon termination creates an additional nexus between the termination payments and his prior employment.

Because, as in Schelble v. Commissioner, 130 F.3d 1388 (10th Cir. 1997), the contract value payments to Mr. Farnsworth were based on the quantity (length of service) and quality (final 6 months' earnings without reduction for post termination events) of the services rendered by Mr. Farnsworth, and because of the causal relationship between retentions and the right to "contract value" payments at termination, Farmers's contract value payments to Mr. Farnsworth are subject to self-employment tax.

Petitioners attempt to distinguish Schelble on three grounds. First, petitioners argue, without citation of authority, that the holding of Schelble should not apply to the case at hand because the taxpayer was an insurance agent, while Mr. Farnsworth was a district manager. Petitioners fail to explain how a difference in Mr. Farnsworth's title or duties would make any difference in the result. The fact remains that there is a sufficient nexus between the payments and Mr. Farnsworth's self-employment services to cause the payments to be subject to the self-employment tax.

Second, petitioners argue that the payments in Schelble were "based on the future commissions the Agent would have earned if

the Agent had stayed with the insurance company". The termination payments in Schelble were based on a percentage of the renewal commissions paid during the final months of the contract. One of Schelble's companies paid between 50 percent and 150 percent of the commissions for the final 12 months of service, while the other company paid between 50 percent and 100 percent of the commissions for the final 6 months of service. In both cases, the percentage depended on the length of the agent's term of service. Petitioners argue that the holding in Schelble should not apply to the case at hand, where the termination payments are based on prior earnings rather than future commissions. Again, we reject petitioners' argument. In Newberry v. Commissioner, 76 T.C. 441, 444 (1981), we held that it does not matter whether the income arises from a "past, present, or future income-producing activity". See also Schumaker v. Commissioner, 648 F.2d 1198, 1200 (9th Cir. 1981) (self-employment income determined from source of income, not taxpayer's status when income realized); sec. 1.1402(a)-1(c), Income Tax Regs. (self-employment income may include payments received from services provided in a prior taxable year).

Finally, petitioners argue that the termination payments should be treated as gain or loss from the sale of property under section 1402(a)(3)(C), rather than as ordinary self-employment income. Following a long line of authority, we held in Clark v.

Commissioner, T.C. Memo. 1994-278 and Lowers v. Commissioner, T.C. Memo. 1991-75, that the "contract value" payments upon termination of a Farmers DMAA constitute ordinary income and not capital gains from the sale of property.  In Clark we stated:

> Under the 1967 Agreement, all * * * rights or privileges for the continuing effectiveness of policies produced on behalf of any of the Companies, including all records pertaining thereto, were and should at all times remain the property of Farmers.  The short answer is that petitioner transferred nothing to Farmers.  The contract with Farmers was not sold or exchanged, but was terminated.  On December 31, 1986, petitioner's services as a Farmers district manager came to an end. The local agents that petitioner had obtained for Farmers remained, as before, local agents of Farmers. * * *

See also Deal v. Commissioner, T.C. Memo. 1973-49 (ordinary income treatment for termination payment by Farmers under earlier form of Farmers DMAA).

Like the taxpayers in Clark, Lowers, and Deal, Mr. Farnsworth did not sell any property to Farmers.  Farmers owned all the business property used by Mr. Farnsworth.  The DMAA between Mr. Farnsworth and Farmers provides:

> The District Manager understands and agrees that all lists and records of any kind pertaining to policyholders or expirations, and also the information contained therein, are the secret and confidential property of the Companies and shall never be used or divulged, except as specifically authorized by, and for the benefit of, the Companies.

The payments Mr. Farnsworth received were expressly in consideration for the termination of the DMAA contract; the payments were not made in return for the transfer of specific

property owned by him.  Neither in form nor substance was the transaction at issue a sale of property by Mr. Farnsworth.

The "contract value" termination payments to Mr. Farnsworth under the DMAA are subject to self-employment tax.

To reflect concessions of the parties,

<u>Decision will be entered under Rule 155</u>.